CENTER FOR AUTO SAFETY,
INC. and Public Citizen,
Inc., Plaintiffs,

v.

NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,
Defendant.

No. CIV.04–392(ESH).

United States District Court,
District of Columbia.

Sept. 30, 2004.

Bonnie I. Robin–Vergeer, Public Citizen Litigation Group, Washington, DC, for Plaintiffs.

Jane M. Lyons, United States Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs challenge the policy of the National Highway Traffic Safety Administration ("NHTSA"), including its 1998 letter to manufacturers, permitting "regional recalls" of defective motor vehicles. Plaintiffs ask the Court to invalidate the 1998 letter and the practice of regional recalls and to enjoin NHTSA from approving future regional recalls. They contend that: (1) the practice of allowing regional recalls violates the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. § 30101 *et seq.;* (2) the 1998 letter amounts to a *de facto* legislative rule issued without the benefit of notice and comment in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553 and 706(2)(D); and (3) the 1998 letter is arbitrary and capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A). (Compl. ¶¶ 27–32.)

Plaintiffs have moved for summary judgment on these claims, and defendant has moved to dismiss, arguing that plaintiffs lack standing and fail to state a claim. For the reasons stated below, the Court will grant defendant's motion to dismiss and deny plaintiffs' motion for summary judgment.

## FACTUAL AND STATUTORY BACKGROUND

### I. The Parties

The Center for Auto Safety and Public Citizen are non-profit consumer organizations that advocate for strong federal safety standards to protect drivers and passengers. (Compl. ¶¶ 2–3.) They bring this action on behalf of their members who have been excluded from recalls because of the location of their residence. The Department of Transportation ("DOT") is the federal agency charged with ensuring safe transportation, and NHTSA, an agency within DOT, is charged with carrying out the Safety Act. 49 C.F.R. § 1.50(a).

### II. Statutory Framework

The Safety Act seeks to ensure the safety of motor vehicles, and it authorizes the Secretary of Transportation to undertake various activities to that end.[1] 49 U.S.C. § 30101 ("The purpose of this chapter is to reduce traffic accidents and deaths and injuries resulting from traffic accidents.") For example, the Safety Act directs the Secretary of Transportation to issue motor vehicle safety standards. 49 U.S.C. § 30111(a). No motor vehicle or motor vehicle equipment may be sold unless it complies with these safety standards. 49 U.S.C. §§ 30112(a), 30115.

At issue here are the Safety Act's notification and remedy—or "recall"—procedures, which are triggered when a "defect"[2] related to "motor vehicle safety"[3] is

---

1. In turn, the Secretary of Transportation has delegated most of the functions that are at issue in this action to the Administrator of NHTSA. 49 C.F.R. § 1.50.

2. The Safety Act defines "defect" as "any defect in performance, construction, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. § 30102(a)(2).

identified. A defect may be identified—and thus notification and remedy requirements may be triggered—in one of two ways: (1) by the manufacturer or (2) by NHTSA. 49 U.S.C. §§ 30118(b)(2), (c). First, the statute requires a manufacturer who "learns [that] the vehicle or equipment contains a defect and decides in good faith that the *defect is related to motor vehicle safety* " to notify "the owners, purchasers, and dealers." 49 U.S.C. § 30118(c)(1) (emphasis added).[4]

Alternatively, a defect may be identified by NHTSA through its broad investigatory powers. *See* 49 U.S.C. § 30166(b)(1)(A) (authorizing NHTSA to conduct any inspection or investigation necessary to enforce the statute). NHTSA collects information about possible motor vehicle and equipment defects through a variety of sources, including manufacturers' reports of defects and proposed recalls. 49 C.F.R. §§ 579.2, 573.6. An office within NHTSA—the Office of Defects Investigation ("ODI")—considers all available information and determines whether to investigate potential defects. 49 C.F.R. § 554.5 (ODI "elicits from every available source and evaluates on a continuing basis any information suggesting the existence of a safety-related defect."). An investigation may lead to administrative enforcement proceedings, which may in turn culminate in an order to the manufacturer to notify consumers of the safety-related defect and

to provide a remedy. 49 U.S.C. §§ 30118(b)(1) & (2).

Specifically, if after an investigation the manufacturer has not decided to voluntarily issue a 573 Report and conduct a recall, but the agency makes an initial determination that the vehicle contains a safety-related defect, NHTSA must immediately notify the manufacturer of its initial determination. 49 U.S.C. § 30118(a). Then, the manufacturer and any interested party may present, at a public hearing or in writing, "information, views, and arguments showing that there is no defect . . . or that the defect does not affect motor vehicle safety." 49 U.S.C. § 30118(b)(1); *see also* 49 C.F.R. § 554.10(b). After considering these arguments, the agency may affirm its initial decision that a motor vehicle or equipment contains a safety-related defect and order the manufacturer to provide notice and a remedy. § 30118(b).

When a defect is identified, regardless of whether it was identified by the manufacturer or the agency, the statute mandates consumer notification. *See* § 30118(b)(2)(A) (requiring notification after the agency makes a final defect determination); § 30118(c) (requiring notification when a manufacturer identifies a defect related to motor vehicle safety). Notification is intended to inform vehicle owners about safety-related defects and to encourage them to have the defects remedied as quickly as possible. 49 C.F.R. § 577.2. The statute lays out spe-

---

3. "Motor vehicle safety" means "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle." 49 U.S.C. § 30102(a)(8).

4. This process is initiated by the manufacturer with the filing of a "573 Report" to

NHTSA. 49 C.F.R. § 573.6. The report is named for the section of the regulation that governs it, and it must provide, *inter alia*, the manufacturer's name, identification of the vehicles (*e.g.*, make, line, model, and year) containing the defect, the number of vehicles affected, and descriptions of the defect, the events leading to the manufacturer's conclusion that the defect was safety-related, and the plan for remedying the defect. *Id.*

cific requirements to meet this goal. For example, the notice must clearly describe the defect, assess the risk to motor vehicle safety, describe measures to be taken to remedy the defect, and inform the consumer that the manufacturer will provide a remedy free of charge.[5] 49 U.S.C. § 30119(a). When describing the defect, the notice must identify the vehicle system or equipment affected, and it must describe the malfunction that may occur as a result of the defect, "any operating or other conditions that may cause the malfunction to occur," and any precautions that might reduce the risk of malfunction. 49 C.F.R. §§ 577.5(e)(1)-(4). "When the manufacturer determines that the defect . . . *may* not exist in each such vehicle . . ., he may include an additional statement to that effect." 49 C.F.R. § 577.5(d) (emphasis added). However, the notice may not include any other disclaimer indicating that "there is no defect, that the defect does not relate to motor vehicle safety, or that the defect is not present in the owner's or lessee's vehicle." 49 C.F.R. § 577.8(a).

Notification about a safety-related defect must be sent to "each person registered under State law as the owner and whose name and address are reasonably ascertainable by the manufacturer" or "to the most recent purchaser known to the manufacturer." 49 U.S.C. § 30119(d).[6] If NHTSA determines that the notice did not result in an "adequate number of motor vehicles or items of replacement equipment" being "returned for remedy," it may order the manufacturer to send a second notice. § 30119(e).

To determine whether the manufacturer has reasonably met the notification requirements, the agency is authorized to conduct a hearing at which "[a]ny interested person" may "make written and oral presentations of information, views, and arguments on whether the manufacturer has reasonably met the notification requirements." § 30118(e). If NHTSA determines that the manufacturer has not reasonably met the notification requirements, it may order the manufacturer to take appropriate action. *Id.*

When notification is required—that is, when a safety-related defect is present, regardless of whether it was identified by the agency through a hearing or the manufacturer through a 573 Report—the manufacturer must also "remedy the defect . . . without charge" by repairing or replacing the vehicle or providing a refund. 49 U.S.C.A. § 30120(a)(1); *see also* § 30118(b)(2)(B). At a hearing, the manufacturer and interested persons may present information, views, and argument on, and NHTSA may decide, whether the manufacturer reasonably met the remedy requirements. § 30120(e). If a manufacturer fails to meet the remedy requirements, NHTSA has the authority to order specific action by the manufacturer. *Id.*

There are two exceptions to the Safety Act's recall requirements. First, a free remedy is not required "if the motor vehicle or replacement equipment was bought by the first purchaser more than 10 calendar years" before notice is given. § 30120(g). Additionally, upon application by the manufacturer, NHTSA may exempt a manufacturer if a defect is "inconsequential to motor vehicle safety," but interested

---

**5.** Moreover, regulations implementing the Safety Act mandate particular words and typefaces to be used in the notice. 49 C.F.R. § 577.5(a).

**6.** Notification about replacement equipment or tires must be sent to the most recent purchaser, or under certain circumstances, public notice may be required. §§ 30119(d)(2) & (3).

persons must be given an opportunity to provide input on the exemption. § 30120(h).

Interested persons may initiate or challenge a recall by petitioning the agency to take action. First, an interested person may ask the agency to decide whether a motor vehicle contains a defect related to motor vehicle safety, and thus, whether to order a recall. 49 U.S.C. § 30162(a)(2); 49 C.F.R. §§ 552.1, 552.3(b). If the petition is granted, the agency initiates an investigation. 49 C.F.R. § 554.6(a). In addition, interested persons may petition NHTSA to hold a hearing to determine whether a manufacturer has reasonably fulfilled its obligations to provide notice and a remedy.[7] 49 U.S.C. §§ 30118(e), 30120(e); 49 C.F.R. § 557.3.

## III. Regional Recalls

At issue in this case is the situation where a manufacturer identifies a safety-related defect and then conducts a regional recall to address it. This practice began in the mid–1980s. At that time NHTSA permitted manufacturers to conduct recalls in states or regions largely of their own choosing. Between 1992 and 1998, there were eighteen regional recalls, and since the issuance of the NHTSA letter, there have been twenty-two regional recalls. (Pls.' Opp. to Def.'s Mot. to Dismiss ["Pls.' Opp."] Second Decl. of Clarence M. Ditlow ["Second Ditlow Decl."] ¶ 2; Def.'s Opp. to Pls.' Mot. for Summ. J. ["Def.'s Opp."] Decl. of Kenneth N. Weinstein ["Weinstein Decl."] ¶ 9.)[8] All of these have been initiated by manufacturers. (Def.'s Opp. at 5; Pls.' Mot. for Summ. J. ["Pls.' Mot."] at 16.) In contrast, during the period from 1992 to 2002, manufacturers initiated approximately 3,000 nationwide recalls. (Weinstein Decl. ¶ 9.) Accordingly, regional recalls represent roughly one percent of all vehicle recalls.

## IV. NHTSA Letters

To address the ad hoc nature of manufacturer-initiated regional recalls, NHTSA sent manufacturers a letter in 1997 addressing its "concerns" over recalls structured to remedy "safety-related defects in vehicles located in select regions of the United States." (Pls.' Mot. Decl. of Clarence M. Ditlow ["Ditlow Decl."] Ex. 10 (1997 Letter from NHTSA to manufacturers ["NHTSA 1997 Letter"] at 1.)) NHTSA advised that "safety-related defects should be remedied on a nationwide basis, except where manufacturers can demonstrate otherwise," and that its "policy will be to request manufacturers seeking to conduct such recalls to discuss the need for limiting a recall's geographic scope with the agency before the manufacturer makes a public statement concerning the scope of the recall." (*Id.*) Furthermore, NHTSA planned to audit all regional recalls to "verify the effectiveness of the recall and to identify the number of vehicles that received the remedy." (*Id.*)

In 1998, NHTSA sent another letter to manufacturers setting out "policy guidelines" for regional recalls. (Ditlow Decl. Ex. 2 (1998 Letter from NHTSA to manufacturers ["NHTSA 1998 letter"]); *see also id.* Ex. 11 (Letter of Aug. 12, 1998 from NHTSA to Ford) ["Ford Letter"] (describing the "agency's general poli-

---

**7.** If a petition is denied, notice must be published in the Federal Register. 49 U.S.C. § 30162(d); 49 U.S.C. § 557.6(c).

**8.** In their papers, the parties refer to thirty-nine total regional recalls, but in a supple-

mental declaration, Mr. Ditlow cited forty regional recalls since 1992, which includes Ford's recent July 2004 regional recall. (Second Ditlow Decl. ¶ 2.)

cy").) [9] This letter reiterates the 1997 letter's statement that "as a general matter, safety-related defects must be remedied on a nationwide basis, unless the manufacturer can justify a limited geographic scope." (NHTSA 1998 Letter at 1.) The letter then describes two categories of weather-related defects: (1) those likely to manifest themselves after just a short-term or single exposure to a particular weather condition, and (2) those likely to occur only after long-term or recurring exposure.[10] (*Id.* at 1–2.) The agency determined that regional recalls would not be appropriate for the former category because an uncommon weather event or a brief visit to an area where the particular condition was common could trigger the safety hazard. (*Id.* at 1–2.) However, as to the latter category, the letter states that the agency "will approve" a regional recall "if the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States." (*Id.* at 2.) Thus, the manufacturer need only provide notice and a free remedy to those in the identified region, but since it is possible that other vehicles may be exposed to the weather condition—for example, persons living in "border states" may frequently travel into the identified region—manufacturers must ensure that vehicles from outside the region that experience the problem are "taken care of appropriately." (*Id.*)

In addition to these weather-related regional recalls, NHTSA's 1998 letter addresses "safety problems caused by corrosion from long-term exposure to road salt." (*Id.*) A corrosion-related regional recall must include, "*at a minimum,*" vehicles originally sold or currently registered in one of twenty listed states or the District of Columbia. (*Id.* at 2–3 (emphasis added).) [11] To protect motor vehicle owners who move into an area covered by a regional recall, the agency "will require manufacturers to conduct at least one follow-up notification, usually after two or three years." (*Id.* at 2.) The letter concluded by reiterating that manufacturers must discuss all regional recalls with the agency before making any public statements regarding the scope. (*Id.* at 3.)

On May 15, 2002, CAS wrote to NHTSA criticizing the agency's regional recall policy, and arguing that when manufacturers conduct regional recalls, they often draw illogical distinctions between included and excluded states. (Ditlow Decl. Ex. 23 (Letter from CAS to NHTSA (May 15, 2002) ["CAS 2002 Letter"]).) NHTSA responded, acknowledging that inconsistencies in the way regional recalls were administered prior to 1998 had prompted it, in its 1998 letter, to "clarify[ ] NHTSA's policy" with respect to regional recalls. (*Id.* Ex. 24 (Letter from NHTSA to CAS (Nov. 1, 2002) ["NHTSA 2002 Letter"]) at

9. NHTSA mailed slightly different versions of the letter to various manufacturers. (*Compare* NHTSA 1998 Letter (the form letter) *with* the Ford Letter and Ditlow Decl. Ex. 12 (1998 Letter from NHTSA to Chrysler ["Chrysler Letter"]).)

10. An example of the latter category is "a recall for a defect related to corrosion caused by road salt, but it also includes defects related to long-term exposure to temperature extremes or other environmental factors." (NHTSA 1998 Letter at 1.)

11. Prior to 1998, manufacturers had conducted corrosion-related regional recalls that included far fewer states. For example, in 1993 General Motors ("GM") recalled Chevrolet Caprice cars in fourteen states to correct a corrosion-related defect. (Ditlow Decl. Ex. 3 at 12.) And in 1998, prior to NHTSA's letter, Chrysler initiated a corrosion-related recall that covered only fifteen states and the District of Columbia. (Def.'s Opp. Decl. of Jonathan White ["White Decl."] ¶ 19 & Ex. 5.)

1.) NHTSA stated that "[u]nder that policy, in each instance in which a manufacturer proposes to conduct a regional recall," ODI "reviews the nature of the defect, the proposed scope of the recall, and the problem[s] experience[d]" to ensure that such a recall is appropriate under the particular circumstances. (*Id.* at 1–2.) After reiterating the policy set out in its 1998 letter, the agency explained that it did not violate the applicable statute or regulations, since a defect that creates problems only in the presence of certain weather conditions does not constitute a "defect that relates to motor vehicle safety," and thus, pursuant to the Safety Act, it would not necessitate a recall because such a defect would not "lead to failures or crashes." (*Id.* at 2.) NHTSA further noted that "if we subsequently become aware of a significant number of failures outside of the covered region, we can open a recall query investigation to consider whether to compel the manufacturer to broaden the geographic coverage of the recall." (*Id.* at 3.) Moreover, the agency responded that it did not violate the regulations' prohibition on disclaimers by sanctioning the practice of including in a national recall notice language describing the likely scope of short-term exposure defects. (*Id.*) It also noted that since 1997, the agency had conducted more than ten investigations to ensure that proposed regional recalls were appropriate, resulting in at least two expansions of proposed regional recalls. (*Id.*)

Plaintiffs now bring suit to invalidate NHTSA's regional recall policy. First, they argue that regional recalls contravene the statute and should be prohibited. In the alternative, they argue that even if regional recalls are permitted under the statute, the agency's 1998 letter amounts to a *de facto* legislative rule that must be subject to notice-and-comment rulemaking and should be set aside as arbitrary and capricious agency action. 5 U.S.C. §§ 706(2)(A) & (D). While defendant challenges each of these arguments in its motion to dismiss, it also argues that plaintiffs lack standing to raise these claims. In particular, defendant argues that plaintiffs have failed to satisfy the constitutional and prudential standards for establishing their standing to raise their substantive and procedural claims. The Court will first turn to these standing arguments and then to defendant's grounds for dismissal.

## LEGAL ANALYSIS

### I. Standing

#### A. Constitutional Limits

■ The question of standing involves both limitations placed on federal court jurisdiction by Article III of the United States Constitution and prudential limitations on its exercise. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). To meet the constitutional requirements, a plaintiff must show that: (1) he has suffered an injury which is concrete and particularized, as well as actual or imminent rather than conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Utility Air Regulatory Group v. EPA*, 320 F.3d 272, 277 (D.C.Cir.2003).[12]

12. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.").

Plaintiff's standing is based on the doctrine of associational standing recognized in *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).[13] The Supreme Court has articulated the requirements for associational standing as follows:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. To survive this challenge, plaintiffs "must show that at least one of its members meets the irreducible constitutional minimum of standing," *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1265 (D.C.Cir. 2004) (internal citation and quotation marks omitted), by showing that at least one member suffered an injury that was fairly traceable to NHTSA's 1998 letter and likely to be redressed by a judicial decision declaring regional recalls to be unlawful and enjoining their use.[14] Plaintiffs have met this test.

The declarations of members and leaders of plaintiffs' organizations demonstrate plaintiffs' injury. (*See* Pls.' Mot. Decl. of Mary Ann Morgan ["Morgan Decl."]; Pls.' Opp. Decl. of Grady Stone ["Stone Decl."].) For example, Mary Ann Morgan, a CAS member and original purchaser of a 1995 Ford Mercury Tracer, was excluded from a regional recall. (Morgan Decl. ¶¶ 2, 5.) The Tracer's cracked gas tank, which her vehicle experienced, was the subject of Ford's recall in certain hot-weather states, but because her car was registered in Missouri—a state excluded from Ford's list— she was not notified of the defect, despite living thirty miles from an included state, and she was left to pay the full cost of a remedy.[15] (*Id.* ¶¶ 3–7.) *Cf. Utility Air*, 320 F.3d at 277–78 (no standing where plaintiff failed to identify any instances in which any member was adversely affected by the agency action). Likewise, Grady Stone, a Public Citizen member who

13. Defendant refers to this doctrine as "representative standing" (*see, e.g.,* Def.s' Mot. at 12), but following the Supreme Court's holding in *Hunt*, this Court will refer to it as "associational standing." 432 U.S. at 343, 97 S.Ct. 2434.

14. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ...." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C.Cir.1990) (the Court's "standing determination must not be confused with our assessment of whether the party could succeed on the merits").

15. Defendant's quibbles with the timing of plaintiffs' injuries are simply inapposite. Defendant contends that Ms. Morgan could not possibly have suffered an injury due to NHTSA's 1998 letter since Ford's recall was initiated in 1997. (Def.'s Reply in Support of Mot. to Dismiss ["Def.'s Reply"] at 8.) This argument misses the mark. First, NHTSA's 1998 letter to Ford specifically addresses the 1995 Mercury Tracer recall of which Ms. Morgan complains, concluding that Ford's designated region was underinclusive, and requiring certain hot-weather U.S. territories— but not Ms. Morgan's home state of Missouri—to be covered by the recall, and thus, her injury could be said to flow from that letter. (Ford Letter at 3, 5 (acquiescing in Ford's recall criteria, but requiring inclusion of U.S. territories meeting that criteria).) But more importantly, although plaintiffs challenge NHTSA's 1998 letter embodying its regional recall policy, their broader attack is on the policy itself (Compl. ¶ 32), and thus, the particular date of the recall that Ms. Morgan protests is irrelevant. She has alleged that she was injured by a regional recall, and that is enough.

owned a 1993 Ford Taurus was excluded from four recalls in 1997 and 1998 because he lived in Georgia, a state excluded from all four recalls. (Stone Decl. ¶¶ 4–5.) Because he "received no notice from Ford of any kind regarding these regional recalls" or any remedy (*id.* ¶ 5), he has also alleged a concrete injury.[16]

Defendant also contends that because plaintiffs' claims "hinge on the independent choices of the regulated third party"—the manufacturers—plaintiffs' injuries are not fairly traceable to NHTSA's actions and could not be redressed by the remedies they seek. (Def.'s Mot. to Dismiss ["Def.'s Mot."] at 16.) However, it is by no means impossible to establish causation and redressability where plaintiffs' injury stems from government regulation of a third party. *See Lujan,* 504 U.S. at 562, 112 S.Ct. 2130; *Competitive Enter.,* 901 F.2d at 113 ("petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality" suffices "even in cases where the injury hinges" on conduct of regulated third parties). Causation "is satisfied by a demonstration that an administrative agency authorized the injurious conduct." *America's Cmty. Bankers v. FDIC,* 200 F.3d 822, 827 (D.C.Cir.2000); *see also Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 441 (D.C.Cir.1998) (harm was fairly traceable to regulation, which plaintiff alleged permitted third party conduct that would have been illegal absent the regulation). Here, even if defendant is correct in its assertion that NHTSA's role is not to "approve" regional recalls (Def.'s Mot. at 17), plaintiffs' injuries are still fairly traceable to NHTSA's policy of allowing regional recalls since, had NHTSA disallowed regional recalls, nationwide recalls would surely have been the norm and plaintiffs' injuries stemming from the limited scope of regional recalls would not have resulted.

Moreover, the harm plaintiffs allege from regional recalls would surely be redressed if the Court were to grant plaintiffs' request to invalidate regional recalls and enjoin NHTSA from approving them in the future. Speculation that manufacturers would persist in conducting regional recalls in the face of such a ruling is insufficient to defeat standing. *Animal Legal Def. Fund,* 154 F.3d at 441 ("only by taking extraordinary measures—*i.e.,* violating the law ...—could third parties prevent redress" of petitioners' injuries) (internal citation and quotation marks omitted). In other words, causation and redressability are satisfied in this case because the manufacturers' regional recalls are not independent of NHTSA's policy. *Cf. Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930, 940–42 (D.C.Cir. 2004) (schools' decisions to eliminate mens' sports programs were independent of agency's regulation governing funding for equal sports opportunities).[17]

**16.** Defendant's argument that the Safety Act no longer applied to Mr. Stone's vehicle at the time plaintiffs filed their complaint lacks merit, as the statute only excludes a remedy for a purchaser who bought a vehicle "more than 10 calendar years ... before" the manufacturer gave notice of the defect. 49 U.S.C. § 30120(g). Since the recalls took place in 1997 and 1998, the ten-year limit did not exclude Mr. Stone, who purchased his Taurus in 1992. (Stone Decl. ¶ 2).

**17.** Defendant also challenges plaintiffs' standing by characterizing their claims as a "broad programmatic attack," which the Supreme Court recently rejected as a grounds for finding standing in *Norton v. Southern Utah Wilderness Alliance,* — U.S. —, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). (Def.'s Mot. at 9–10.) This argument completely misconstrues plaintiffs' complaint. In *Southern Utah,* the plaintiffs alleged that the Bureau of Land Management failed to act to protect public land from off-road vehicle use in con-

## B. Prudential Limits

■ Defendant also contends that plaintiffs lack prudential standing because they fall outside the zone of interests protected by the Safety Act. The prudential requirements for standing are judicially imposed limits on the exercise of federal jurisdiction. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). This includes the "requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). A court must discern the interests arguably to be protected by the statutory provision and then determine if the plaintiffs' interests are among them. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *cf. Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 389, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (no prudential standing where plaintiff's interests are so "marginally related to ... the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit"). This test is "not demanding." *PDK Labs., Inc. v. DEA,* 362 F.3d 786, 791 (D.C.Cir.2004).

■ Although "Congress's purposes in enacting the *overall* statutory scheme are relevant *only* insofar as they may help reveal its purpose in enacting the particular provision," *Grand Council of the Crees v. FERC,* 198 F.3d 950, 956 (D.C.Cir.2000) (emphasis in original), the Safety Act's purpose of "reduc[ing] traffic accidents and deaths and injuries resulting from traffic accidents," 49 U.S.C. § 30101, certainly reveals Congress' reasons for enacting the statute's notice provisions. Defendant's argument that only those persons permitted to petition NHTSA to commence an investigative proceeding fall within the statute's zone of interests is unconvincing. (Def.'s Mot. at 20; Def.'s Reply at 14.) But even accepting defendant's argument, Congress allows "any interested person" to petition NHTSA to commence a defect investigation or to determine whether a manufacturer has reasonably met the statute's notice and remedy provisions. 49 U.S.C. §§ 30162(a), 30118(e), 30120(e). Thus, it is beyond dispute that the interests of plaintiffs' members who were allegedly deprived of notification of safety-related defects in their motor vehicles are within the statute's zone of interests. *Int'l Bhd. of Teamsters v. Pena,* 17 F.3d 1478, 1483 (D.C.Cir.1994) (interest of truck drivers' union in "highway safety is indisputably one that the [Commercial Motor Vehicle] Safety Act ... seek[s] to advance, and so the union plainly has [prudential] standing" to challenge an implementing rule as violative of the statute.)

## C. Procedural Standing

■ Defendant also alleges that plaintiffs lack standing to challenge NHTSA's failure to follow notice and comment procedures before issuing its 1998 letter. A

---

travention of its statutory mandate to manage the land in a manner suitable to preservation as a wilderness. 124 S.Ct. at 2377–78. Plaintiffs sought, under the APA, to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Court disagreed, finding that such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" 124 S.Ct. at

2379 (emphasis in original). Here, plaintiffs seek not to *compel* any agency action specifically demanded by law, for they do not launch a programmatic attack on NHTSA's administration of the statute; rather, they challenge NHTSA's specific and concrete policy that permits certain regional recalls. (Compl. ¶ 32 (asking the Court to declare unlawful the practice of recalls and to enjoin NHTSA from approving future recalls).)

special standing doctrine applies when litigants attempt to vindicate procedural rights, such as the right to have notice of proposed regulatory action and to offer comments relating to such action. *Sugar Cane Growers Coop. of Florida v. Veneman*, 289 F.3d 89, 94–95 (D.C.Cir.2002). The Supreme Court has held that "where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs," they can establish standing "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 & n. 7, 112 S.Ct. 2130.

> In addition to a particularized injury (not just an abstract desire to see the government follow its own procedural rules), a plaintiff asserting a procedural violation must show a "causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."

*Iyengar v. Barnhart*, 233 F.Supp.2d 5, 13 (D.D.C.2002) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C.Cir. 1996)). In other words, "a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority"— such as the APA's notice and comment requirements—"at least if the procedure is intended to enhance the quality of the substantive decision." *Teamsters*, 17 F.3d at 1484. Plaintiffs acknowledge that they "cannot assert with certainty that the notice-and-comment rulemaking process would have altered NHTSA's decision about whether to authorize automakers to conduct regional recalls," (Pls.' Opp. at 27), but that is not necessary. Because plaintiffs' interests fall within the zone of interests protected by the Safety Act, and because the opportunity to comment on NHTSA's regional recall policy is linked to their alleged injuries resulting from regional recalls, they have satisfied the necessary causation and injury requirements. The Court will now turn to the merits of defendant's motion to dismiss.

## II. Validity of Regional Recalls Under the Safety Act

Plaintiffs argue that "NHTSA's practice of permitting manufacturers to conduct regional recalls violates the Safety Act." (Compl.¶ 28.) As an initial matter, defendant claims that NHTSA's policy is not reviewable since it would encroach on the agency's enforcement authority under the Safety Act, which is "presumptively unreviewable" by the courts under the doctrine enunciated in *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). (Def.'s Opp. at 10–11; *see also* Def.'s Mot. at 29 (anything NHTSA does after receiving a 573 Report from a manufacturer is "subject to its considerable enforcement discretion which may not be the subject of judicial review").) Under *Heckler*, "an agency's decision not to prosecute or enforce, whether through civil or criminal process," is shielded from review under the APA because that is "a decision generally committed to an agency's absolute discretion." 470 U.S. at 831, 105 S.Ct. 1649. This argument must be rejected, since it is based on a misapprehension of plaintiffs' claim.

In contrast to an agency's exercise of its enforcement discretion in a specific case, "an agency's adoption of a general enforcement policy is subject to review," *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C.Cir.1998), for such a policy is not the same as a "single-shot non-enforcement decision." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C.Cir.1994). Thus, an "agency's statement of a general enforcement policy

may be reviewable for legal sufficiency where the agency has ... articulated it in some form of universal policy statement." *Crowley,* 37 F.3d at 676.[18] Because plaintiffs' attack on NHTSA's regional recall policy is divorced from any specific regional recall or factual scenario, *Heckler* does not preclude review. *Edison Elec. Inst. v. EPA,* 996 F.2d 326, 333 (D.C.Cir.1993) ("Clearly, [the agency's] interpretation has to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review."); *see also OSG,* 132 F.3d at 812 (because the agency's action was not a "single-shot non-enforcement decision," general jurisdiction statutes afforded jurisdiction to review the agency's action).

Turning now to the merits of defendant's argument that plaintiffs' claim should be dismissed, the Court must consider whether the Safety Act precludes regional recalls. Because this question is presented in the abstract—that is, plaintiffs do not challenge a regional recall in the context of any particular set of facts—the Court must determine whether regional recalls constitute a *per se* violation of the statute.

"The first traditional tool of statutory construction focuses on the language of the statute." *Bell Atlantic Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997). Here, the Safety Act's recall procedures are triggered—and the entire recall procedure begins—when a "defect related to motor vehicle safety" is identified. 49 U.S.C.

§ 30118(a) & (b). The Safety Act defines these two critical terms. It defines "defect," in a circular manner, as "any defect in performance, construction, a component, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. § 30102(a)(2). And "motor vehicle safety" is "the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle." § 30102(a)(8).

The statute is silent on the issue of whether recalls must be nationwide. It does, however, provide that the determination of whether a recall is required will be fact-specific, and thus, subject to the agency's expertise and judgment. § 30118(b)(1) (the "*Secretary may* make a final decision that a motor vehicle or replacement equipment contains a defect related to motor vehicle safety" only after giving the manufacturer and other interested parties an opportunity to provide input). As part of this fact-bound determination, the agency must consider a vehicle's "performance," which clearly implies that consideration must be given to the manner in which the vehicle is used. Thus, the D.C. Circuit found, considering both the statute's language and its legislative history, that a motor vehicle or component contains a " 'defect' if it is subject to a *significant number of failures* in *normal operation,*" including those failures occurring during

---

**18.** As explained in *Crowley:*

> By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute

> rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as [*Heckler v. Chaney* ] recognizes, peculiarly within the agency's expertise and discretion.

*Id.* at 677.

**14**

"specified use" or resulting from predictable abuse, but not including those resulting from normal deterioration due to age and wear. *United States v. Gen. Motors*, 518 F.2d 420, 427 (1975) ("*Wheels*") (emphasis added). Thus, usage is clearly relevant to a determination of whether a vehicle contains a safety-related defect, and "[i]t is possible that the same component may contain a defect in performance relating to motor vehicle safety in one class of vehicle *or use* but not in another." *Id.* at 439 n. 88 (emphasis added).[19]

■ With this in mind, it becomes readily apparent that the statute does not outlaw regional recalls; rather, it envisions that the agency will exercise its discretion to determine whether a safety-related defect exists in a given scenario. To this end, it is logical to include a vehicle's locale of operation when considering its "use" and "normal operation." In other words, a motor vehicle may contain a safety-related defect when used in some states but not in others, and so if a vehicle experiences a significant number of failures in a specific climate, it is fair to conclude that the vehicle has a safety-related defect related to performance. Consider, for example, a "defect" that manifests itself after long-term exposure to snow. Such a "defect" is "related to motor vehicle safety" in cold weather states, but it is not so in hot-weather states, where it would not adversely affect "the performance of a motor vehicle" in a way that contributes to an "unreasonable risk of death or injury in an accident." § 30102(a)(8) (defining "motor vehicle safety"). Such an interpretation is plainly consistent with the Safety Act's purpose, which is to "reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101.[20]

Common sense dictates the same result. It would defy logic to find that the Safety Act, which strives to reduce traffic-related safety risks, would require a recall for *all* defects, even those that would not reasonably lead to a reduction in traffic accidents. The D.C. Circuit has agreed, finding that the statute's linkage of the terms "defect" and "motor vehicle safety" invites a "commonsense approach" to the meaning of "defect," and reflects an awareness that "costs must be considered in determining what safety measures are required by the Act." *Wheels*, 518 F.2d at 435–36 (citing *Hearings on Traffic Safety Before the Senate Commerce Comm.*, 89th Cong.2d Sess. 1 (1966) (opening remarks of Sen. Magnuson), and finding that the "motor vehicle safety" definition addressed "unreasonable risks" and thus, "signif[ied] a 'commonsense' balancing of safety benefits and eco-

**19.** In *Wheels*, the Circuit considered whether GM had complied with the statute's notice requirements when it failed to notify truck owners after learning that a large number of wheel failures had occurred. 518 F.2d at 426. Determining that there were unresolved issues of fact regarding whether the failures were due to gross abuse, the Circuit remanded the case for trial. *Id.* at 446–47.

**20.** The Court notes that the legislative history proffered by plaintiffs does not yield a different result. Plaintiffs first argue that because the statute's drafters intended to impose a "rigorous, mandatory procedure on manufacturers of defective vehicles," and later amend-ments made "safety recalls more inclusive," it must follow that regional recalls are impermissible. (Pls.' Mot. at 19.) While it is true that the Senate Report cited by plaintiffs evidences an intent to impose stringent notice standards, it does not indicate that nationwide recalls are required to meet this goal. *See* S.Rep. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712. Likewise, later amendments extending the free remedy to ten years (49 U.S.C. § 30120(g)(1)) and requiring reimbursement for repairs made prior to the recall (49 U.S.C. § 30120(d)) are simply irrelevant to the issue of whether recalls may be conducted on a regional basis.

nomic cost"). Recognizing that even though "some margin of safety must be built-in," the Court concluded that "manufacturers are not required to design ... vehicles that never fail," and the cause of a "defect" must be considered in determining whether a recall is required. *Id.* at 436. A regional recall is consistent with this commonsense approach. It considers the usage of a vehicle and the cause of any "defect" in determining the appropriate scope of a recall.[21]

Plaintiffs counter by arguing that regional recalls involve not defects in "performance"—which may contemplate usage—but rather defects in "construction, components, or materials," and from this, they conclude that all defects necessitate national recalls because, regardless of where or how the vehicle is used, the car would be defective. (Pls.' Reply at 3–4 (citing *Clarke v. TRW, Inc.*, 921 F.Supp. 927, 933–34 (N.D.N.Y.1996)).) This argument is, however, unconvincing. Climate-related recalls are inherently performance-related, whereas component or construction defects manifest themselves regardless of weather conditions. Moreover, the case cited by plaintiffs does not support a conclusion that national recalls are statutorily required. In *Clarke*, the court found that while the determination that a vehicle contains a *performance*-related defect re-

quires consideration of the number of actual vehicle failures, a defect in *construction* and *components* may not. *Id.* But the court went on to note the commonsense notion that determining whether any "defect" relates to "motor vehicle safety" requires a balancing of safety benefits and economic costs. *Id.* at 934 ("motor vehicle safety" contemplates protecting the public against an "unreasonable risk"). "An unreasonable risk, then, is a significant risk that can be remedied at a proportionate cost, and without a corresponding sacrifice of public safety." *Id.* (internal citation and quotation marks omitted). Although some safety risks clearly warrant nationwide recalls due to the nature of the risk, *see United States v. Gen. Motors Corp.*, 565 F.2d 754, 760 (D.C.Cir.1977) ("*Carburetors*") (requiring notification where faulty construction "will in the future cause at least some operators and passengers to be confronted with the clear dangers attending a sudden fire in the engine"), plaintiffs' contention that the identification of *any* faulty component or construction must trigger a nationwide recall is not material to the resolution of the pertinent question here: whether weather-related safety defects must be remedied nationwide.[22]

Likewise, plaintiffs' citation to the requirement that "each person" (regardless

---

**21.** Plaintiffs seem to argue that because vehicles registered in an excluded state may sometimes be driven into an included state, regional recalls are impermissible because this is within the vehicle's expected range of operation. (Reply in Support of Pls.' Mot. ["Pls.' Reply"] at 3 (citing *Wheels*, 518 F.2d at 439).) But manufacturers need not ensure that no vehicle ever fails; rather, they must protect against a significant number of failures in normal operation. *Wheels*, 518 F.2d at 436. This must be determined on a case-by-case basis. Thus, even if some failures of vehicles in border states are due to the weather conditions, it cannot be said that this necessitates nationwide recalls in *all* instances. Moreover, if a significant numbers of vehicles

in "border states" fail due to exposure to the weather conditions, the regional recall can be expanded. (NHTSA 2002 Letter at 3.)

**22.** Plaintiffs also point out that all regional recalls thus far have been manufacturer-initiated. In plaintiffs' view, this amounts to an admission by the manufacturer "that the vehicles are defective and subject to the recall provisions." (Pls.' Mot. at 16.) However, plaintiffs read the last five words out of the operative phrase—a manufacturer need only notify consumers of a "defect *related to motor vehicle safety*." 49 U.S.C. § 30118(a)-(c) (emphasis added).

of where he or she lives) who owns one of a class of vehicles subject to the recall is "entitled to notice" and a remedy does not assist in resolving the question before the Court. (Pls.' Reply at 2 (citing 49 U.S.C. § 30119(d)(1)(A)).) Section 30119 sets out procedures directing that "[n]otification required under section 30118 ... about a motor vehicle *shall* be sent ... to each person registered ... as the owner," or barring that, to "the most recent purchaser." §§ 30119(d)(1)(A) & (B). Thus, section 30119 refers to section 30118 to determine under what circumstances a notice must be sent. Section 30118, in turn, *mandates* notice once a determination has been made that "the vehicle" contains a "defect related to motor vehicle safety." §§ 30118(b)(2)(A) (if the agency makes a final safety-related defect determination, the Secretary "shall order" notification) and (c) (if the manufacturer identifies the defect, it "shall notify" owners). Thus, the requirement for notice turns on whether "the vehicle" contains a safety-related defect, not on who owns the vehicle or where that person lives. Accordingly, even if the "each person" language in section 30119(d)(1)(A) invites no exceptions (Pls.' Opp. at 30)—an issue this

Court need not resolve—plaintiffs' argument skirts the fundamental query of what triggers the notice requirement. Since the Court has already determined that weather conditions in a particular region may be considered in determining whether a vehicle contains a safety-related defect, plaintiffs' argument regarding notice must be rejected.

Accordingly, the Court concludes that regional recalls are not prohibited by statute. Rather, the Safety Act incorporates the notion that it is for the agency, in the exercise of its discretion and expertise, to determine, based on the specific facts presented, whether a safety-related defect exists in a vehicle.[23]

### III. Notice and Comment

The APA requires an agency to follow certain procedures—known as "notice and comment"—before promulgating a rule. 5 U.S.C. § 553(b).[24] Plaintiffs claim that NHTSA's 1998 letter to manufacturers violates this APA requirement because it "sets forth a de facto legislative rule." (Compl.¶ 32.) In response, defendant claims that the letter is a "policy statement" within the meaning of the APA,[25]

---

**23.** Plaintiffs also contend that NHTSA exceeded its statutory authority by adopting the regional recall policy embodied in the 1998 letter. They argue that an agency "does not have the power to adopt a policy that directly conflicts with its governing statute." (Pls.' Opp. at 32 (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 134–35, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)).) Because the Court has determined that regional recalls do not contravene the Safety Act, this argument must also fail.

**24.** The APA's notice and comment requirements are found in 5 U.S.C. § 553(b):

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise

have actual notice thereof in accordance with law. The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
*Id.*

**25.** The exceptions to the APA's notice and comment requirements are also found in 5 U.S.C. § 553(b):

Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules, *general statements of policy*, or rules of agency organization, procedure, or practice ....
*Id.* (emphasis added).

and as such, is exempt from the APA's notice and comment procedures. Thus, whether the 1998 letter should have been subjected to notice and comment procedures turns on whether the letter is a legislative rule or a general statement of policy.

In general, the case law reflects two related formulations for determining whether a challenged action is a rule or a general policy statement. The first "focuses on the effects of the agency action." *CropLife Am. v. EPA,* 329 F.3d 876, 883 (D.C.Cir.2003). It requires the Court to consider whether the agency action (1) "impose[s] any rights and obligations," and (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Cmty. Nutrition Inst. v. Young* *("CNI"),* 818 F.2d 943, 946 (D.C.Cir.1987); *see also Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1046 (D.C.Cir.1987). The other line of analysis "focuses on the agency's expressed intentions." *CropLife,* 329 F.3d at 883. That is, it requires consideration of three factors: "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA,* 197 F.3d 543, 545 (D.C.Cir.1999). "[T]he ultimate focus of [this] inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, *i.e.,* that it has the force of law." *Id.* "The two tests overlap at step three of the *Molycorp* formulation—in which the court determines whether the agency action *binds private parties or the agency itself with the force of law.*" *Gen. Elec. v. EPA,* 290 F.3d 377, 383 (D.C.Cir.2002) (emphasis added).

▮ Although the demarcation between a binding rule and a general statement of policy may be "tenuous" or even "en-shrouded in considerable smog," *CNI,* 818 F.2d at 946, NHTSA's 1998 letter easily falls on the "policy" side of the line. On its face, the 1998 letter leaves NHTSA free to exercise its discretion. The 1998 letter characterizes its contents as *"policy guidelines* with respect to ... 'regional recalls.'" (NHTSA 1998 Letter at 1 (emphasis added).) Although "[t]he agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the force of law," *CropLife,* 329 F.3d at 883, that is not the case here. First, the letter does not suggest that regional recalls will be rubber-stamped. If a manufacturer files a Part 573 Report that includes a regional recall that the agency considers to be inadequate, NHTSA may investigate the matter. The language of the 1998 letter clearly preserves this discretion. Indeed, it warns manufacturers that "as a general matter, safety-related defects must be remedied on a nationwide basis, unless the manufacturer can justify a limited geographic scope." (NHTSA 1998 Letter at 1.) And, it informs manufacturers that they must "demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion in the area proposed for inclusion than in the rest of the United States," and that the "manufacturer's justification for such a proposal should be based on objective factors, and not merely on differences in complaint rates among the states." (*Id.* at 2.) Also, it "reiterate[s] that, as [the agency] noted in [its 1997] letter ..., manufacturers must discuss all proposals to limit the geographic scope of any recall with ODI prior to making any public statements regarding the scope." (NHTSA 1998 Letter at 3.)

Plaintiffs argue nonetheless that the letter's mandatory language makes it a binding rule rather than a general policy

statement. While the use of mandatory language suggests the "rigor of a rule, not the pliancy of a policy," *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320–21 (D.C.Cir.1988); *see also CNI*, 818 F.2d at 946, the letter's use of these words cannot be read in isolation. *Guardian Fed. Savings & Loan Ass'n v. Fed. Savings & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C.Cir.1978) ("The form of a regulation is obviously not controlling; substance and effect will determine whether a rule is a 'general statement of policy.'"). When read in context, it is clear that these apparently mandatory word choices were not intended to bind the agency. For example, the letter states that "*if* the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States, NHTSA will approve a regional recall." (NHTSA 1998 Letter at 2 (emphasis added).) [26] Moreover, the letters' statements—that "the manufacturer *will be required*" to notify owners of vehicles registered in the relevant states, and "*will* only have to provide the free recall remedy to those vehicles"— only reiterate the statute's requirement that, once a safety-related defect is identified, the manufacturer must send a notice and provide a remedy to those affected vehicles. (*Id.* (emphasis added).) The letter does nothing to limit the agency's discretion to determine *whether* a safety-related defect exists. Where, as here, the agency's language is "replete with indications that the Secretary retained his discretion," it is a policy, not a binding rule. *Brock v. Cathedral Bluffs Shale Oil Co.*,

796 F.2d 533, 538 (D.C.Cir.1986) (describing situations in which enforcement is "ordinarily appropriate," and providing criteria that "as a general rule" will apply to determine the operator's responsibility for independent contractors' actions).

NHTSA's 2002 letter confirms the agency's continued intent to maintain its discretion. Referring to its 1998 letter, NHTSA notes that "[u]nder that policy, in each instance in which a manufacturer proposes to conduct a regional recall, [ODI] reviews the nature of the defect, the proposed scope of the recall, and the problem[s] experience[d] to assure that such a recall is appropriate under the particular circumstances." (NHTSA 2002 Letter at 1–2.) The 2002 letter also indicates that "if we subsequently become aware of a significant number of failures outside of the covered region, we can open a recall query investigation to consider whether to compel the manufacturer to broaden the geographic coverage of the recall." (*Id.* at 3.) Thus, far from "cabining" its discretion to enforce the Safety Act's notice requirements, *CNI*, 818 F.2d at 948, NHTSA's letters evince an intention to continue to evaluate each regional recall on a case-by-case basis and to exercise its authority to enforce the notice requirements when appropriate. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 39 (D.C.Cir.1974) ("When the agency states that in subsequent proceedings it will thoroughly consider not only the policy's applicability to the facts of a given case but also the underlying validity of the policy itself, then the agency intends to treat the order as a general statement of policy"); *cf. Gen. Elec.*, 290 F.3d at 384 (agency guidance

---

**26.** Contrary to plaintiffs' argument, this statement cannot be read to mean that the agency has ceded its discretion. Quite the opposite. The agency, consistent with the statute, is telegraphing the need for the manufacturer to justify, "based on objective factors," its exemption from the general rule that "safety-related defects must be remedied on a nationwide basis," and only if this is done to the agency's satisfaction, will it permit a regional recall. (*Id.* at 1–2.)

was a binding rule because it sent a clear message to the reader that it "will not be open to considering approaches other than those prescribed in the Document").[27]

Nor has it been the agency's practice to treat the 1998 letter as binding. "[A]n agency pronouncement will be considered binding as a practical matter if it . . . is *applied* by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383 (emphasis added); *see also Guardian*, 589 F.2d at 666 ("When the agency applies the policy in a particular situation, it must be prepared to defend it, and cannot claim that the matter is foreclosed by the prior policy statement."); *cf. McLouth*, 838 F.2d at 1321 ("More critically than [the agency's] language . . ., its later conduct applying it confirms its binding character."). Rather than applying the 1998 letter as a binding rule, NHTSA has in fact exercised its discretion to expand proposed regional recalls if it, in its discretion, concludes that a manufacturer's proposed scope is too limited. For example, in its 1998 letter, NHTSA notified Ford that four of its previous regional recalls addressed a single-exposure safety defect, and accordingly, the agency "urg[ed]" Ford to notify all owners nationwide. (Ford Letter at 5.) With respect to a fifth regional recall, NHTSA notified Ford that the scope must be expanded to include hot-weather U.S. territories. (*Id.*)[28] This was not an isolated instance. Similarly, General Motors initiated a corrosion-related regional recall in 2000 limited to fifteen states. (White Decl. Ex. 7.) However, upon "ODI's prompting, the recall was expanded to 20 states." (*Id.* ¶ 21 & Ex. 7.) And in 1999, Volkswagen proposed a regional recall. (White Decl. ¶ 20 & Ex. 6.) NHTSA reminded Volkswagen by letter that "NHTSA's policy is to require manufacturers to discuss the possibility of limiting a recall's geographic scope with the agency," and that "NHTSA will audit safety recalls with a limited geographic scope to ascertain the effectiveness of the recall." (White Decl. Ex. 6 (Letter of June 7, 1999 from NHTSA to Volkswagen at 1).) To this end, NHTSA submitted an information request to Volkswagen. (*Id.*) After a meeting with NHTSA, Volkswagen agreed to expand the notification nationwide. (White Decl. Ex. 6 (ODI Resume at 2).)[29] The fact that NHTSA has enjoyed success in obtaining voluntary compliance through informal means does not mean that it has treated its policy as binding. Indeed, there is no evidence that NHTSA has *ordered* expansion of a regional recall under section 30118(b)(2) (pursuant to which the agency "shall order" a recall upon making a final determination that a safety-related defect exists). Instead, NHTSA's 1998 letter explained to manufacturers how it proposed to exercise its discretion in determining the propriety of future regional recalls, and in practice the agency has in fact applied this policy flexibly.

---

27. Moreover, the agency did not publish its policy in the Federal Register, further evincing its intent that the policy was *not* meant to be a binding rule. *Brock*, 796 F.2d at 538 (failure to publish in the Federal Register indicates that "the statement in question was *not* meant to be a regulation") (emphasis in original).

28. NHTSA notified Ford that if it did not comply with its suggestions and expand the specified recalls, NHTSA *"may"* commence a hearing under 49 U.S.C. §§ 30118(e) or 30120(e) to determine whether Ford reasonably complied with the Safety Act's notice and remedy requirements. (Ford Letter at 5.)

29. Other proposed recalls have been expanded to include NHTSA's delineated states. For example, in 1998 Ford expanded a 1993 recall to include the delineated states. (White Decl. ¶ 16.) And in 2002 and 2004, Ford also conducted recalls that included at least the delineated states. (Def.'s Reply Decl. of Kathleen C. DeMeter ¶¶ 3–4.)

It is thus evident that NHTSA has treated its 1998 letter as enforcement guidelines to advise agency personnel and manufacturers about how NHTSA intends to use its discretion with respect to regional recalls. This is exactly what was contemplated by the 1947 Attorney General's Manual on the APA when it explained that "general statements of policy," which are excepted from notice and comment procedures, include "statements issued by an agency to *advise the public prospectively* of the manner in which the agency *proposes to exercise a discretionary power.*" *United States Department of Justice Attorney General's Manual on the Administrative Procedure Act* § 4, at 30 n. 3, *available at* http://www.oalj.dol.gov/public/apa/refrnc/ag03.htm (last visited Sept. 29, 2004) (emphasis added); *see also Am. Hosp. Ass'n,* 834 F.2d at 1046 (a general policy statement "allow[s] agencies to announce their tentative intentions for the future, without binding themselves") (internal citation and quotation marks omitted). Consistent with this approach, courts have uniformly construed enforcement guidelines as policy statements. For example, in *Guardian,* the plaintiff challenged the procedural validity of a rule issued without notice and comment. The rule used "directive language" in specifying the bank audit criteria that would satisfy a previously promulgated regulation, but it left the agency's Chief Examiner with discretion to accept any non-conforming audits, and he later exercised this discretion. 589 F.2d at 666–67. "The mandatory tone of the specifications for audits and auditors doubtless encourages compliance," but "an opportunity for an individualized determination [was] afforded." *Id.* at 667. Likewise, in *Brock,* the Supreme Court found that an "Enforcement Policy and Guidelines" document, which was to be "used by inspectors as guidance in making individual enforcement decisions" about whether to hold a mine operator responsible for an independent contractor's safety violations, established non-binding norms and was not subject to notice and comment. 796 F.2d at 538. Despite stating that operators were responsible for "assuring compliance" by independent contractors, the document, when taken as a whole, "announced [the agency's] tentative intentions for the future," leaving the agency "free to exercise [its] informed discretion in individual enforcement actions." *Id.; see also Pac. Gas & Elec.,* 506 F.2d at 45 (a Federal Power Commission order setting forth its view of the proper priority schedule for supplying natural gas to certain customers in the hypothetical event of a shortage was a policy statement); *Molycorp,* 197 F.3d at 546 (non-binding statements of the agency's view of particular activities was best described as a policy statement).

The D.C. Circuit has recognized the practical wisdom and "not inconsiderable benefits" inherent in policy statements that "appris[e] the regulated community of the agency's intentions as well as inform[ ] the exercise of discretion by agents and officers in the field." *CNI,* 818 F.2d at 949. The advance-notice function of policy statements "yields significant informational benefits, because policy statements give the public a chance to contemplate an agency's views before those views are applied to particular factual circumstances," and it "facilitates long range planning within the regulated industry and promotes uniformity." *Panhandle E. Pipe Line Co. v. FERC,* 198 F.3d 266, 269 (D.C.Cir.1999). The NHTSA letter did just that. It provided guidance to the manufacturers and ODI as to how NHTSA intended to encourage uniformity and statutory compliance with respect to regional recalls. The intent was not to increase the use of such recalls, but rather to establish

the minimum requirements that must be met before a regional recall could be considered as permissible under the statute and not potentially subject to an enforcement action. But by issuing this guidance, NHTSA did not surrender its discretion to assess each regional recall on an individualized basis. It simply regularized its previously ad hoc practice and thereby gave manufacturers the opportunity to anticipate the agency's actions so as to facilitate planning on their part and to promote uniformity and efficiency on the agency's part.

In contrast, in *General Electric*, guidance was found to be binding because the agency "d[id] not contend that in practice it has not treated the Guidance Document as binding." 290 F.3d at 385. There, a statute prohibited the production of a certain chemical unless the process posed no unreasonable health risk. An EPA regulation identified generic methods for testing risk, but it allowed parties to apply to use an alternate method. A guidance document then described two acceptable methods, which the agency had treated as binding in practice. *Id.* at 383, 385. Thus, if a company produced this product, it was in effect required to use one of the two agency testing methods. *Id.* at 385. As found by the Court, because the guidance document purported to bind applicants and the agency, and it was treated by the agency as binding, it had the force of law. *Id.* at 385. That is not the situation here. Not only has NHTSA treated its policy as nonbinding, but also, rather than imposing a mandate on the regulated party (as the EPA did in *General Electric*), the NHTSA

letter simply provides its views on how it intends to analyze regional recalls.

Plaintiffs disagree. They argue that NHTSA's identification of twenty states and the District of Columbia as necessary inclusions for corrosion-related regional recalls is akin to a binding norm, for a manufacturer that notifies vehicle owners in those states of a corrosion-related safety defect "would likely be immune to many of the enforcement tools in NHTSA's arsenal." (Pls.' Opp. at 37–38.) The letter, however, states that "[w]e have reviewed several factors, . . . and have determined that, *at a minimum*, vehicles originally sold in or currently registered in the following states must be included in any regional recall related to corrosion caused by road salt." (NHTSA 1998 Letter at 2–3 (emphasis added).) Although plaintiffs cite evidence showing that NHTSA has persuaded manufacturers to conduct corrosion-related recalls in all twenty delineated states (Pls.' Reply at 10–11 (citing General Motors Recall); *see also* note 29, *supra*, and White Decl. Exs. 6 & 7), this does not demonstrate that NHTSA fails to exercise its discretion in each recall to determine if a defect is safety-related if the vehicle is exposed to salt conditions, and certainly, since the letter only establishes the minimum number of states, the agency can always require, as it has in fact done, more. *Cf. Molycorp*, 197 F.3d at 546 (counsel's reference to a document's "advisory role" in enforcement proceedings did not mean that the "document itself would be given any weight at all in enforcement proceedings").[30]

30. Indeed, it appears that NHTSA has not always applied the salt-belt requirement to all corrosion-related recalls. Prior to NHTSA's 1998 letter, Chrysler initiated a recall and proposed to limit it to fifteen states plus the District of Columbia, and in 1999, it expanded the recall to include more makes and models. (White Decl. ¶ 19 & Ex. 5.) In December 1999, NHTSA asked Chrysler to include five additional states in the 1999 recall, but Chrysler refused, explaining that of the 102 complaints it had received regarding the make and model subject to the recall, only five originated outside the fifteen states it identi-

Plaintiffs also argue that a statement in NHTSA's 1998 letter significantly alters the previously-adopted regulation prohibiting "disclaimers" in notice letters, thus necessitating notice and comment. (Pls.' Mot. at 36–37; Pls.' Reply at 12–13.) This argument is unpersuasive. "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. Dist. of Columbia Arena*, 117 F.3d 579, 586 (D.C.Cir.1997). Defendant's regulations provide that, when notice is required due to a safety-related defect, the notice shall not,

> *except* [as otherwise provided in the regulations,] contain any statement or implication that there is no defect, that the defect does not relate to motor vehicle safety, or that the defect is not present in the owner's or lessee's vehicle or item of replacement equipment.

49 C.F.R. § 577.8(a) (emphasis added).

Plaintiffs argue that the 1998 letter significantly changes this requirement. The letter recognizes that the "likelihood of experiencing a safety problem" as the result of a short-term exposure safety defect "is relatively low in certain regions of the country," and thus, "notwithstanding 49 C.F.R. § 577.8," manufacturers may "include language in the letters to owners of vehicles in 'low-risk' states" indicating that the "defect is unlikely to cause a safety problem if the vehicle is not exposed to the meteorological condition at issue." (1998 Letter at 1–2.) In its 2002 letter, NHTSA clarified that such a notice could include language "that describes the likely scope

of the defect" (NHTSA 2002 Letter at 3), and that this was consistent with the regulations allowing a manufacturer that voluntarily initiates a recall and "determines that the defect . . . *may not exist in each such vehicle*" to "include an additional statement to that effect." 49 C.F.R. § 577.5(d) (emphasis added). In other words, because a given "defect" may be weather-related, it "may not exist in each" vehicle, particularly those registered in a state that does not frequently experience the relevant weather condition. This is a reasonable reading of the two regulations, and thus, the 1998 letter did not constitute a regulatory change that would have required notice and comment.

In sum, because the policy embodied in NHTSA's 1998 letter was "neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications," *Panhandle*, 198 F.3d at 269 (internal citation and quotation marks omitted), it was not subject to notice and comment procedures.

## IV. Arbitrary and Capricious

Finally, plaintiffs claim that "NHTSA's rule setting forth the circumstances under which regional recalls will be permitted . . . is arbitrary, capricious, and an abuse of discretion" in violation of the APA, 5 U.S.C. § 706(2)(A). (Compl. ¶ 30.) Under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." § 704. Thus, the Court must initially determine whether NHTSA's 1998 letter constitutes a "final agency action." A "final agency ac-

---

fied. (White Decl. Ex. 5 (Letters of Dec. 23, 1999 and May 10, 2000 from Chrysler to NHTSA).) Plaintiffs argue that NHTSA would not have been able to retroactively apply its policy to Chrysler's recall, which was first initiated prior to NHTSA's issuance

of its letter. (Pls.' Reply at 11 n. 5.) But even if this argument were credited, the fact that Chrysler initially challenged the twenty-state requirement reflects the manufacturers' view that the policy was not set in stone.

tion" is one (1) that is final, that is, it "mark[s] the consummation of the agency's decisionmaking process," and (2) from which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett,* 520 U.S. at 177–78, 117 S.Ct. 1154 (internal citation and quotation marks omitted); *Indep. Equip. Dealers Ass'n v. EPA,* 372 F.3d 420, 426 (D.C.Cir.2004) ("*IEDA*"); *see also Alaska Dept. of Envtl. Conservation v. EPA,* 540 U.S. 461, 124 S.Ct. 983, 998–99, 157 L.Ed.2d 967 (2004).

When considering whether letters issued by an agency constitute final agency actions, the D.C. Circuit has recently emphasized that—much like the determination of whether agency action constitutes a rule or a policy—the question hinges on whether the agency's statement was binding. For example, in *General Motors Corp. v. EPA,* 363 F.3d 442, 447 (D.C.Cir.2004), GM sought review of EPA letters to automobile manufacturers in which the agency interpreted the relevant statute's definition of "solid waste" to include certain automobile paint solvents, thus exposing these solvents to stringent disposal standards under EPA's regulations. Rather than representing the culmination of the EPA's position on the issue, the letters restated a previously settled position, and no legal consequences flowed from them, for they compelled no one to do anything. *Id.* at 450–51. The letters, which were "merely preliminary enforcement statements made as part of an informal agency-industry dialogue and, of themselves, finally determine no rights or obligations of involved parties," did not constitute a final agency action. *Id.* at 453. Likewise, in *IEDA,* the EPA responded to the petitioner's inquiry about whether destination-specific labeling of imported engines violated EPA emissions certification requirements. 372 F.3d at 424–25. EPA conceded that the letter was final, but it contended that its letter

had no legal consequences. *Id.* at 426–27. In evaluating the letter, the Circuit framed its inquiry as whether the letter setting out the agency's interpretation "constitutes reviewable agency action." *Id.* at 427. The answer was "obvious" upon an examination of the letter's "concrete impact … in short, none whatsoever." *Id.* The letter merely restated EPA's longstanding interpretation, which had been set out in previous industry guidance and letters, and it was "purely informational in nature," imposing "no obligations and den[ying] no relief." *Id.* "Compelling no one to do anything, the letter had no binding effect whatsoever—not on the agency and not on the regulated community." *Id.* It was merely a "workaday advice letter." *Id.*

■ From these decisions, it is apparent that whether NHTSA's letter amounts to final agency action depends on whether it is binding—does it impose obligations or fix legal consequences, and does it state a new policy rather than restate a longstanding agency interpretation? According to plaintiffs, NHTSA's letter is analogous to the guidance document in *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1022–23 (D.C.Cir.2000), which determined obligations and had legal consequences for the regulated party. There, the EPA issued a guidance document requiring states to conduct periodic monitoring of certain pollution sources for which they issued operating permits. *Id.* at 1019–20. The guidance represented "the agency's settled position, a position it plan[ned] to follow in reviewing State-issued permits, a position it [insisted] State and local authorities comply with …, [and] a position EPA officials in the field [were] bound to apply." *Id.* at 1022. The "entire Guidance … read[ ] like a ukase. It command[ed], it require[ed], it order[ed], it dictate[d]," and through the document EPA gave states their "march-

ing orders," which all but two obeyed. *Id.* at 1023. Here, as this Court has already determined, unlike EPA's guidance in *Appalachian Power*, NHTSA's letters are not binding. Like the *General Motors* and *IEDA* letters, NHTSA's 1998 letter left it free to exercise its discretion in enforcing regional recalls, neither requiring nor ordering the manufacturers to do anything. The letter reflects non-binding prospective enforcement policies designed to inform the industry and agency personnel regarding how the agency intends to exercise its enforcement discretion. *Cf. Pennsylvania Mun. Auth. Ass'n v. Horinko*, 292 F.Supp.2d 95, 104–06 (D.D.C.2003) (decision regarding issuance of a specific permit *was* binding, but guidance issued by EPA regional authorities was *not* binding "until something more happens").

Contrary to plaintiffs' argument, NHTSA's 1998 letter does not represent a new regulatory scheme. Regional recalls date back to the 1980s and at least as early as 1997, the agency informed the industry of its intent to encourage uniformity and effectiveness in regional recalls. (NHTSA 1997 Letter at 1.) Previously there had been no guidance regarding regional recalls, and they had occurred on an ad hoc basis for over a decade. For example, prior to 1998, Ford had conducted a regional recall of Aerostars in thirteen states, while corrosion-related recalls from Chrysler, GM, and Nissan included fifteen, fourteen, and nineteen states, respectively. (White Decl. ¶¶ 18, 19; Ditlow Decl. Ex. 3 at 12, 19.) The 1998 letter reiterated that recalls should be conducted on a nationwide basis except where a manufacturer could justify a more limited scope. (NHTSA 1998 Letter at 1; *see also* NHTSA 1997 Letter at 1.) It also sought to encourage a coherent approach to regional recalls by establishing a floor (*not* a ceiling) for the number of states to be included in recalls relating to corrosion due to road salt, limiting the use of region-

al recalls in the case of short-term or single exposure, and establishing limits on the previously unrestrained use of regional recalls. (NHTSA 1998 Letter at 2–3.)

Because NHTSA's letter simply reiterated a previously stated agency policy of allowing regional recalls and because it imposed no binding obligations, it does not constitute final agency action. As such, it is not reviewable under the APA's abuse of discretion standard. 5 U.S.C. §§ 704, 706(2)(A). Thus, plaintiffs' claim that the policy is arbitrary and capricious must fail.

### CONCLUSION

For the reasons stated above, the Court finds that regional recalls do not violate the Safety Act, and that NHTSA's 1998 letter constituted a non-binding policy statement rather than a final agency action. As such, it was not subject to the APA's notice and comment procedures, nor was it amenable to review by this Court to determine whether it is arbitrary and capricious.

Accordingly, defendant's motion to dismiss will be granted and plaintiffs' motion for summary judgment will be dismissed. A separate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendant's motion to dismiss is **GRANTED;** and it is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment is **DENIED;** and it is

**FURTHER ORDERED** that this case is dismissed with prejudice.

**SO ORDERED.**