# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 9, 2005　　　　Decided June 23, 2006

No. 04-5402

CENTER FOR AUTO SAFETY AND
PUBLIC CITIZEN, INC.,
APPELLANTS

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00392)

*Bonnie I. Robin-Vergeer* argued the cause for appellants.
With her on the briefs was *Allison M. Zieve*.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause
for appellee. With her on the brief were *Kenneth L. Wainstein*,
U.S. Attorney, *Michael J. Ryan*, Assistant U.S. Attorney, and
*Lloyd S. Guerci*, Assistant Chief Counsel, National Highway
Traffic Safety Administration. *R. Craig Lawrence*, Assistant
U.S. Attorney, entered an appearance.

Before: RANDOLPH and GRIFFITH, *Circuit Judges*, and
EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

EDWARDS, *Senior Circuit Judge*:  The National Highway Traffic Safety Administration Authorization Act of 1991 ("Safety Act" or "Act"), 49 U.S.C. §§ 30,101 *et seq.* (2000), allows automakers to initiate voluntary "recalls" when a motor vehicle or its equipment contains a safety-related defect or does not comply with applicable safety standards.  49 U.S.C. § 30,118(c).  Generally, vehicle owners who are afforded recall notification of a safety-related defect or noncompliance are entitled to a free remedy from the manufacturer.  The National Highway Traffic Safety Administration ("NHTSA") administers the Safety Act and monitors manufacturer-initiated recalls.

Beginning sometime in the mid-1980s, automakers adopted a practice of initiating "regional recalls."  Under this practice, when a safety-related defect was caused by exposure to atypical climatic conditions, automakers gave notification and free remedies only in regions experiencing the climatic conditions that caused the identified safety-related defect.  For example, if vehicle components corroded when exposed to salt, manufacturers limited their recalls to owners in states that used the most salt on their roads.  In 1997, Kenneth N. Weinstein, NHTSA's Associate Administrator for Safety Assurance, sent letters to some major automakers and a trade association, acknowledging that regional recalls had been authorized in the past, but stating that the agency now had "concerns" about the practice.  *See* 1997 Letters from NHTSA to Manufacturers and Trade Associations, *reprinted in* Joint Appendix ("J.A.") 136-38.  In 1998, Kenneth N. Weinstein and other NHTSA officials sent letters to various motor vehicle manufacturers outlining NHTSA's "policy guidelines" for "regional recalls."  *See, e.g.*, Generic Version of 1998 Letter from NHTSA to Manufacturers

at 1, *reprinted in* J.A. 80 (hereafter "1998 policy guidelines" or "guidelines").

On March 10, 2004, Center for Auto Safety ("CAS") and Public Citizen, Inc. ("Public Citizen") filed a lawsuit in District Court challenging the "regulatory regime governing regional recalls established in NHTSA's 1998 letter to automakers." Br. for Appellants at 16. Appellants claimed that the 1998 policy guidelines constitute a "de facto legislative rule" that violates the Safety Act, and that, even if regional recalls are permissible in some circumstances, the policy statement violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* (2000), "because it is arbitrary and capricious and was promulgated without public notice and comment." Br. for Appellants at 16. The District Court dismissed the complaint for failure to state a claim. We affirm.

Appellants' claims are not reviewable. *See* 5 U.S.C. § 704 (judicial review under APA is limited to final agency action). For agency action to be "final" and reviewable under the APA, it must generally "mark the consummation of the agency's decisionmaking process" *and* either determine "rights or obligations" or result in "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and internal quotation marks omitted). The disputed 1998 policy guidelines do not establish any binding rules, and they are not finally determinative of the issues to which they are addressed. Therefore, the guidelines are not subject to review. Accordingly, we affirm the judgment of the District Court.

## I. BACKGROUND

### A. The Statutory Framework

The statutory provisions at issue in this case were first enacted by Congress with the passage of the National Traffic and Motor Vehicle Safety Act of 1966, which sought "to reduce traffic accidents" by regulating the safety of motor vehicles.

Pub. L. No. 89-563, 80 Stat. 718, 718 (originally codified at 15 U.S.C. §§ 1381 *et seq.* (1970)). In 1994, that statute was repealed, reenacted, and recodified without material change as part of the National Highway Traffic Safety Administration Authorization Act of 1991. *See* Pub. L. No. 103-272, 108 Stat. 745, 1379, 1385 (1994) (repealing); *id.* at 745, 941-73 (1994) (reenacting and recodifing without substantive changes). Administration of the Safety Act has been delegated to the Secretary of Transportation, who, in turn, has re-delegated his duties under the Act to NHTSA. *See* 49 C.F.R. §§ 1.50(a), 501.2(a)(1) (2005).

The Safety Act includes provisions governing situations when a motor vehicle or its equipment contains a safety-related defect or does not comply with an applicable safety standard. *See* 49 U.S.C. §§ 30,118-30,121. In these situations, the Act requires manufacturers to issue a "recall," providing both notice of the safety-related defect or noncompliance and a free remedy to owners, purchasers, and dealers of the vehicle. 49 U.S.C. §§ 30,118-30,120. The Act allows two exceptions to the recall requirements. First, "[t]he requirement that a remedy be provided without charge does not apply if the motor vehicle or replacement equipment was bought by the first purchaser more than 10 calendar years . . . before notice is given." 49 U.S.C. § 30,120(g)(1). Second, a manufacturer may obtain an exemption from the remedy requirements if, after providing notice and opportunity for public comment, NHTSA determines that "a defect or noncompliance is inconsequential to motor vehicle safety." 49 U.S.C. § 30,120(h); *see also* Exemption for Inconsequential Defect or Noncompliance, 49 C.F.R. pt. 556 (2005).

A recall is triggered in one of two ways. First, NHTSA may initiate administrative enforcement proceedings under the Act. The Act provides as follows:

(a) NOTIFICATION BY SECRETARY.–The Secretary of Transportation shall notify the manufacturer of a motor vehicle or replacement equipment immediately after making an initial decision (through testing, inspection, investigation, or research carried out under this chapter, examining communications under section 30166(f) of this title, or otherwise) that the vehicle or equipment contains a defect related to motor vehicle safety or does not comply with an applicable motor vehicle safety standard prescribed under this chapter. The notification shall include the information on which the decision is based. The Secretary shall publish a notice of each decision under this subsection in the Federal Register. Subject to section 30167(a) of this title, the notification and information are available to any interested person.

(b) DEFECT AND NONCOMPLIANCE PROCEEDINGS AND ORDERS.–

(1) The Secretary may make a final decision that a motor vehicle or replacement equipment contains a defect related to motor vehicle safety or does not comply with an applicable motor vehicle safety standard prescribed under this chapter only after giving the manufacturer an opportunity to present information, views, and arguments showing that there is no defect or noncompliance or that the defect does not affect motor vehicle safety. Any interested person also shall be given an opportunity to present information, views, and arguments.

(2) If the Secretary decides under paragraph (1) of this subsection that the vehicle or equipment contains the defect or does not comply, the Secretary shall order the manufacturer to–

> (A) give notification under section 30119 of this title to the owners, purchasers, and dealers of the vehicle or equipment of the defect or noncompliance; and
>
> (B) remedy the defect or noncompliance under section 30120 of this title.

49 U.S.C. § 30,118(a)-(b).

Second, a vehicle manufacturer may voluntarily initiate a recall. For this alternative, the Act provides as follows:

> (c) NOTIFICATION BY MANUFACTURER.–A manufacturer of a motor vehicle or replacement equipment shall notify the Secretary by certified mail, and the owners, purchasers, and dealers of the vehicle or equipment as provided in section 30119(d) of this section, if the manufacturer–
>
> (1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or
>
> (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under this chapter.

49 U.S.C. § 30,118(c). A manufacturer typically begins a voluntary recall by filing a "Part 573 Report," notifying the agency of its concerns and proposing a remedial program. *See* 49 C.F.R. § 573.6 (2005); *see also* 49 C.F.R. § 573.5 (1998) (reporting requirements for defects and noncompliance between 1996 and 2002). The manufacturer is then required to notify "each person registered under State law as the owner [of an affected vehicle] and whose name and address are reasonably ascertainable by the manufacturer through State records or other available sources," 49 U.S.C. § 30,119(d)(1)(A), or, failing that, "the most recent purchaser known to the manufacturer," 49

U.S.C. § 30,119(d)(1)(B). When a manufacturer undertakes a voluntary recall, this also entails an obligation to "remedy the defect or noncompliance." 49 U.S.C. § 30,120(a)(1).

Even though voluntary recalls are initiated by a manufacturer, NHTSA retains full authority under the Act to oversee and regulate *any* recall. On this score, the statute provides:

> On the motion of the Secretary or on petition of any interested person, the Secretary may conduct a hearing to decide whether the manufacturer has reasonably met the notification requirements under this section. . . . If the Secretary decides that the manufacturer has not reasonably met the notification requirements, the Secretary shall order the manufacturer to take specified action to meet those requirements and may take any other action authorized under this chapter.

49 U.S.C. § 30,118(e); *accord* 49 U.S.C. § 30,120(e) (providing same procedure for remedy requirements); *see* Petitions for Hearings on Notification and Remedy of Defects, 49 C.F.R. pt. 557 (2005).

During any recall, the notification given by a manufacturer must provide vehicle owners with, *inter alia*, detailed information about the defect or noncompliance, the risk to motor vehicle safety, and the measures to be taken to remedy the problem. 49 U.S.C. § 30,119(a); *see* 49 C.F.R. § 577.5(e)-(g) (2005). NHTSA has made it clear that recall notifications should "adequately inform and effectively motivate owners of potentially defective or noncomplying motor vehicles or items of replacement equipment to have such vehicles or equipment inspected and, where necessary, remedied as quickly as possible." 49 C.F.R. § 577.2 (2005).

The Safety Act allows "[a]ny interested person" to "file a petition with [NHTSA] requesting the [agency] to begin a

proceeding . . . to decide whether to issue an order under section 30118(b)" of the statute. 49 U.S.C. § 30,162(a)(2); *see* Petitions for Rule-Making, Defect, and Noncompliance Orders, 49 C.F.R. pt. 552 (2005). Members of the public are also permitted to petition for a hearing to determine whether a manufacturer's recall has reasonably met the notification or remedy requirements of the Act. *See* 49 U.S.C. §§ 30,118(e), 30,120(e). At such hearings, "[a]ny interested person may make written and oral presentations of information, views, and arguments on whether the manufacturer has reasonably met" its statutory obligations. *Id.*

## B. Regional Recalls

Beginning in the mid-1980s, automakers began initiating voluntary recalls on a geographically limited basis when a defect or noncompliance was caused by atypical climatic conditions. For many years, these regional recalls raised no objections from NHTSA. In June 1997, however, NHTSA's Associate Administrator for Safety Assurance, Kenneth N. Weinstein, sent a letter to Ford Motor Company ("Ford"), explaining that the agency "ha[d] concerns over several recent safety recalls conducted by Ford Motor Company (Ford) which were limited in terms of their geographic scope." Letter from Kenneth N. Weinstein, Associate Administrator for Safety Assurance, NHTSA, to L.W. Camp, Director of Automobile Safety and Engineering Standards, Ford (June 9, 1997), *reprinted in* J.A. 137. A month later the agency sent a letter to Chrysler Corporation ("Chrysler"). *See* Letter from Kenneth N. Weinstein, Associate Administrator for Safety Assurance, NHTSA, to Susan M. Cischke, Executive Director for Vehicle Compliance and Safety Affairs, Chrysler (July 9, 1997), *reprinted in* J.A. 136 (advising the company of NHTSA's "concerns over recent safety recalls conducted by certain manufacturers"). A similar letter was sent to the Association of International Automobile Manufacturers on July 10, 1997. *See*

Letter from Kenneth N. Weinstein, Associate Administrator for Safety Assurance, NHTSA, to Philip A. Hutchinson, President and CEO, Association of International Automobile Manufacturers, Inc. (July 10, 1997), *reprinted in* J.A. 138.

A year later, in 1998, NHTSA sent letters to Ford and Chrysler outlining a regional recall policy. *See* Letter from Kenneth N. Weinstein, Associate Administrator for Safety Assurance, NHTSA, to L.W. Camp, Director of Automotive Safety and Engineering Standards, Ford (Aug. 12, 1998), *reprinted in* J.A. 142; Letter from Kenneth N. Weinstein, Associate Administrator for Safety Assurance, NHTSA, to Susan M. Cischke, Executive Director for Vehicle Compliance and Safety Affairs, Chrysler (Sept. 4, 1998), *reprinted in* J.A. 149. These two letters, and one sent to Volkswagen in June of 1999, Letter from Jonathan D. White, Chief of Recall Analysis Division, Office of Defects Investigation, NHTSA, to Andreas H. Steglich, Product Compliance Team Leader, Volkswagen of America, Inc. (June 18, 1999), *reprinted in* J.A. 256, incorporated the text of the "generic version" of the 1998 letter to automakers. *See* Generic Version of 1998 Letter from NHTSA to Manufacturers at 1, *reprinted in* J.A. 80 (setting forth "policy guidelines" with respect to regional recalls).

The 1998 policy guidelines distinguish between "circumstances: (1) when the consequences of the defect occur as the result of a short-term or single exposure to a particular meteorological condition; and (2) when the consequences of the defect generally occur only after long-term or recurring exposure to environmental conditions." *Id.* The guidelines indicate that, as to the former, a regional recall generally is "not appropriate." *Id.* However, they also indicate that NHTSA may, "in some cases," be willing to modify the manufacturer's notification duties. *Id.* at 2, *reprinted in* J.A. 81. Thus, the guidelines state that "the agency may act favorably on requests by manufacturers to include language in the letters to owners of

vehicles in 'low-risk' states . . . that indicates that the defect is unlikely to cause a safety problem if the vehicle is not exposed to the meteorological condition at issue." *Id.* As to defects that arise from long-term exposure, the guidelines say that "if the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States, NHTSA will approve a regional recall." *Id.* There is a caveat that "[t]he manufacturer's justification for such a proposal should be based on objective factors, and not merely on differences in complaint rates among the states." *Id.*

The guidelines also indicate that, in pursuing a regional recall, "manufacturers must assure that vehicles from outside the designated area that experience a problem due to the defect are taken care of appropriately." *Id.* Finally, the guidelines state that the agency "[has] determined that, at a minimum, vehicles originally sold in or currently registered in [20 designated] states [and the District of Columbia] must be included in any regional recall related to corrosion caused by road salt." *Id.* at 2-3, *reprinted in* J.A. 81-82. The guidelines conclude with the following words of caution: "[M]anufacturers must discuss all proposals to limit the geographic scope of any recall with [Office of Defects Investigation] prior to making any public statements regarding that scope." *Id.* at 3, *reprinted in* J.A. 82.

## C. The Legal Challenge in this Case

On May 15, 2002, CAS wrote to NHTSA's new Administrator, taking the agency to task for its policy of "approving" regional recalls. Letter from Clarence M. Ditlow, Executive Director, CAS, to Jeffrey Runge, Administrator, NHTSA (May 15, 2002), *reprinted in* J.A. 216. The agency responded on November 1, 2002, defending the 1998 policy guidelines and attaching the generic version of the letters it sent to automakers. Letter from Kenneth N. Weinstein, Associate Administrator for Enforcement, NHTSA, to Clarence M. Ditlow,

Executive Director, CAS (Nov. 1, 2002), *reprinted in* J.A. 221. CAS followed up with a second letter on September 10, 2003. Letter from Clarence M. Ditlow, Executive Director, CAS, to Jeffrey Runge, Administrator, NHTSA (Sept. 10, 2003), *reprinted in* J.A. 226.   The agency did not respond to CAS' second letter.

Subsequently, on March 10, 2004, CAS and Public Citizen filed suit in District Court challenging the 1998 policy guidelines and the regulatory regime governing regional recalls. They maintained that the agency's policy is contrary to law, because it violates the mandates of the Safety Act, constitutes a *de facto* legislative rule issued without the opportunity for public notice and comment, and is arbitrary and capricious.  *Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 8 (D.D.C. 2004).   On June 24, 2004, appellants moved for summary judgment.   On July 7, 2004, NHTSA responded with a motion to dismiss, on the ground that, *inter alia*, the complaint failed to state a claim upon which relief can be granted.

On September 30, 2004, the District Court granted the agency's motion to dismiss, and denied appellants' motion for summary judgment.  *Id.* at 3.  The District Court concluded that the Safety Act does not prohibit regional recalls.  *Id.* at 16.  It also found that NHTSA's 1998 guidelines set out the agency's policy, not a binding rule, and thus compliance with the APA's notice-and-comment procedures was not required.  *Id.* at 22; *see* 5 U.S.C. § 553(b)(A) (providing that notice-and-comment rulemaking procedures "[do] not apply . . . to . . . general statements of policy").   Finally, the District Court held that plaintiffs' arbitrary and capricious claim failed, because the 1998 policy guidelines did not constitute final agency action. *Ctr. for Auto Safety*, 342 F. Supp. 2d at 24.

On October 29, 2004, CAS and Public Citizen filed a timely notice of appeal.   Their challenge here, as below, is *not* about

NHTSA's threatening enforcement actions against Ford, Chrysler, Volkswagen, or any other automaker. Rather, the entire case is focused on the agency's 1998 policy guidelines. The parties agree that the generic version of the letters that were sent to motor vehicle manufacturers (*i.e.*, "the 1998 policy guidelines") forms the basis of NHTSA's policy with respect to regional recalls.

Oral argument was held on December 9, 2005. Thereafter, we ordered the parties to submit supplemental briefing to address the nature and extent of the authority of Kenneth N. Weinstein, the Associate Administrator for Safety Assurance and apparent author of the 1998 policy guidelines. The parties were asked to address whether Weinstein "had authority to issue policy guidance for the Administration." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, No. 04-5402, Order (D.C. Cir. Dec. 13, 2005).

## II. ANALYSIS

### A. Standard of Review

If we were to assume that the matter under review is the District Court's grant of appellee's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, then the standard of review would be *de novo*. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). However, Rule 12(b) states that, if, on a motion to dismiss for failure to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b). In this case, the District Court considered "matters outside the pleading" in granting the agency's motion to dismiss. In so doing, it effectively treated the motion as one

for summary judgment. Both parties had a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *See* FED. R. CIV. P. 56. Indeed, the external materials relied upon by the District Court were submitted by appellants as declarations and exhibits in support of their motion for summary judgment. And none of these materials raise any genuine issue of material fact. *See* FED. R. CIV. P. 56(c). Therefore, "[w]e may . . . 'characterize[ ]' the district court's dismissal as a grant of summary judgment under Rule 56(c) and affirm." *Fraternal Order of Police v. Williams*, 375 F.3d 1141, 1144 (D.C. Cir. 2004) (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 708 (D.C. Cir. 1977)) (second alteration in original); *see also Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003) (per curiam) ("resulting order" from motion to dismiss "must be treated [on appeal] as a grant of summary judgment under Rule 56" because "parties submitted, and [court] considered, matters outside the pleadings").

"We review *de novo* a district court's decision to grant summary judgment, viewing the evidence in the light most favorable to the non-moving party. A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *U.S. ex rel. Bettis v. Odebrecht Contractors*, 393 F.3d 1321, 1325 (D.C. Cir. 2005) (citing *Kaempe v. Myers*, 367 F.3d 958, 965-66 (D.C. Cir. 2004)).

## B. Decisional Parameters for Determining When Agency Action Is "Final" and Whether Policy Guidelines Constitute Binding Rules

The District Court had jurisdiction over appellants' claims pursuant to 28 U.S.C. § 1331 (2000). Appellants' cause of action rests solely on the APA. Under the APA, "[a]gency action made reviewable by statute *and final agency action for which there is no other adequate remedy in a court* are subject

to judicial review." 5 U.S.C. § 704 (emphasis added). As we noted in *Reliable Automatic Sprinkler,* "in cases such as this one, in which judicial review is sought under the APA rather than a particular statute prescribing judicial review, the requirement of final agency action is not jurisdictional." 324 F.3d at 731 (relying on *Califano v. Sanders*, 430 U.S. 99, 107 (1977) (holding "that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action")); *see also Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985) ("The Supreme Court has clearly indicated that the Administrative Procedure Act itself, although it does not create subject-matter jurisdiction, *Califano v. Sanders,* 430 U.S. 99 (1977), does supply a generic cause of action in favor of persons aggrieved by agency action."); *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002) (same). Rather, § 704 limits causes of action under the APA, as does, for example, § 706(1) ("reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed"), *see Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76-77 (D.C. Cir. 1984). In this case, our focus is on § 704, because the principal disagreement between the parties centers on this provision of the APA.

In order to sustain their position, appellants must show that the 1998 policy guidelines either (1) reflect "final agency action," 5 U.S.C. § 704, or (2) constitute a *de facto* rule or binding norm that could not properly be promulgated absent the notice-and-comment rulemaking required by § 553 of the APA. These two inquiries are alternative ways of viewing the question before the court. Although, if appellants could demonstrate the latter proposition they would implicitly prove the former, because the agency's adoption of a binding norm obviously would reflect final agency action. In either case, appellants would have a viable cause of action.

Agency action is generally "final" and reviewable if two conditions are satisfied:

First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett*, 520 U.S. at 177-78 (citations omitted). *See* 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.' See 5 U.S.C. § 704."); *Reliable Automatic Sprinkler*, 324 F.3d at 731 ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA.").

"In determining whether an agency has issued a binding norm or merely" an unreviewable "statement of policy, we are guided by two lines of inquiry." *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). One line of analysis considers the effects of an agency's action, inquiring whether the agency has "(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (citation and internal quotation marks omitted). The language used by an agency is an important consideration in such determinations. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam). The second line of analysis looks to the agency's expressed intentions. *CropLife Am.*, 329 F.3d at 883. This entails a consideration of three factors: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal

Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999).

As the case law reveals, it is not always easy to distinguish between those "general statements of policy" that are unreviewable and agency "rules" that establish binding norms or agency actions that occasion legal consequences that are subject to review. *Compare Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14, 16 (D.C. Cir. 2005) (holding that there was no final agency action where the language of the challenged Protocols was permissive and "the scope of a [regulated party's] liability under . . . [the statute] remains exactly as it was before the Protocols' publication"); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38, 48 (D.C. Cir. 1974) (noting that a policy statement that "does not establish a binding norm," and "is not finally determinative of the issues or rights to which it is addressed," is not subject to review) (citation and internal quotation marks omitted), *with Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 47-49 (D.C. Cir. 2000) (holding, *inter alia*, that an EPA guidance, which created new reporting requirements for regulated entities, as a directive with legal consequences, amounted to final agency action).

Nevertheless, the distinction between "general statements of policy" and "rules" is critical. If the 1998 policy guidelines constitute a *de facto* rule, as appellants claim, then they would clearly meet *Bennett*'s test for final agency action and § 553 of the APA would require the agency to afford notice of a proposed rulemaking and an opportunity for public comment prior to promulgating the rule. 5 U.S.C. § 553. If the guidelines are no more than "general statements of policy," as NHTSA would have it, then they would neither determine rights or obligations nor occasion legal consequences and, thus, would be exempt from the APA's notice-and-comment requirement. 5 U.S.C. § 553(b)(A).

There is an important caveat with respect to "general statements of policy" that bears mention here: if NHTSA applies the 1998 policy guidelines in a particular situation, it must be prepared to support the policy. "An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy." *Pac. Gas & Elec.*, 506 F.2d at 38-39. This principle may apply even when an agency merely threatens enforcement of a guideline, if the guideline is binding on its face or in practice. *See, e.g.*, *Barrick Goldstrike Mines*, 215 F.3d at 47-50. But the instant case does not involve a challenge to threats of enforcement by NHTSA. Indeed, the petitioners in this case have not even petitioned the agency pursuant to 49 U.S.C. § 30,162(a)(2) to take enforcement action against any automaker.

On the record here, using any of the foregoing lines of analysis, NHTSA's 1998 policy guidelines do not reflect final agency action and they do not constitute binding rules.

## C. The 1998 Policy Guidelines Do Not Reflect "Final Agency Action" and They Do Not Constitute Binding Rules

As noted above, under *Bennett*, the 1998 policy guidelines cannot be viewed as "final agency action" under § 704 of the APA unless they "mark the consummation of the agency's decisionmaking process" *and* either determine "rights or obligations" or result in "legal consequences." *Bennett*, 520 U.S. at 178 (citations and internal quotation marks omitted). It is possible to view the guidelines as meeting the first part of the *Bennett* test, but not the second. The guidelines are nothing more than general policy statements with no legal force. They do not determine any rights or obligations, nor do they have any legal consequences. Therefore, the guidelines cannot be taken as "final agency action," nor can they otherwise be seen to constitute a binding legal norm.

There is no doubt that the guidelines reflect NHTSA's views on the legality of regional recalls. But this does not change the character of the guidelines from a policy statement to a binding rule. Indeed, the case law is clear that we lack authority to review claims under the APA "where 'an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)).

In *AT&T Co.*, we were asked to resolve competing interpretations of the scope of an employer's obligation under the Pregnancy Discrimination Act of 1979. AT&T believed that it was not statutorily required, when calculating pension benefits, to give former employees work credit for pregnancy leaves taken prior to the passage of the act in 1979. *AT&T Co.*, 270 F.3d at 974. EEOC's Compliance Manual took the opposite view, and the agency had issued a Letter of Determination, stating its view that AT&T had thereby violated the act as to two employees. *Id.* The company filed suit seeking judicial imprimatur of its legal view. *Id.* at 975. AT&T conceded that the Letter of Determination was not final agency action, but argued, *inter alia*, "that the Commission [took] final action when it embrace[d] one view of the law and reject[ed] another." *Id.* We were not persuaded:

> Although there are . . . particular circumstances in which an agency's taking a legal position itself inflicts injury or forces a party to change its behavior, such that taking that position may be deemed final agency action, this is not such a case. The Commission has not inflicted any injury upon AT&T merely by expressing its view of the law – a view that has force only to the extent the agency can persuade a court to the same conclusion. Unlike the EPA Guidance at issue in *Appalachian Power* [*Co. v. EPA*, 208 F.3d 1015

(D.C. Cir. 2000)], the EEOC Compliance Manual does not affect the regulated community. Whereas "EPA officials in the field [were] bound to apply" the EPA Guidance, as discussed below the EEOC is not bound to sue AT&T.

*Id.* at 975-76 (citations and accompanying parentheticals omitted) (second alteration in original).

As in *AT&T Co.*, this case involves competing interpretations of the scope of regulated parties' statutory obligations. Auto manufacturers have in effect notified NHTSA that they believe that geographically limited recalls satisfy their statutory obligations under 49 U.S.C. § 30,118(c), if the safety-related defect or noncompliance results from exposure to extreme weather conditions. NHTSA has given some endorsement to regional recalls, delineating its views in the contested 1998 policy guidelines. And appellants contend that the Safety Act prohibits denying owners of defective motor vehicles notice and free remedy solely on the basis of their vehicle's state of original sale or current registration.

As with EEOC's position in *AT&T Co.*, NHTSA's position here is nothing more than a privileged viewpoint in the legal debate. The guidelines do not purport to carry the force of law. They have not been published in the Code of Federal Regulations. They do not define "rights or obligations." They are labeled "policy guidelines," not rules. *See* Generic Version of 1998 Letter from NHTSA to Manufacturers at 1, *reprinted in* J.A. 80 (setting forth "policy guidelines" with respect to "regional recalls"). And they read as *guidelines*, not binding regulations.

For example, the generic letter states: "NHTSA has concluded that, *in general*, it is not appropriate for a manufacturer to limit the scope of a recall to a particular geographical area where the consequences of the defect can occur after a short-term exposure to a meteorological condition."

*Id.* (emphasis added). The language relating to notification obligations for short-term exposure defects is similarly conditional:

> NHTSA believes that *in some cases it may be permissible* for a manufacturer to modify the content of the owner notification letter that is sent to owners in those areas. Therefore, notwithstanding 49 C.F.R. 577.8 ("Disclaimers"), the agency *may act favorably* on requests by manufacturers to include language in the letters to owners of vehicles in "low-risk" states . . . that indicates that the defect is unlikely to cause a safety problem if the vehicle is not exposed to the meteorological condition at issue. However, the letter must make it clear that the owner will be able to obtain a free remedy for the defect if he or she wishes.

*Id.* at 1-2, *reprinted in* J.A. 80-81 (emphasis added); *see also id.* at 2, *reprinted in* J.A. 81 ("[Office of Defects Investigation] *would not normally request* a manufacturer to conduct a follow-up notification campaign . . . .") (emphasis added). Likewise, the language describing the agency's position on regional recalls for safety-related defects resulting from long-term exposure to environmental conditions is only general in its prescriptions. *See id.* at 2, *reprinted in* J.A. 81 ("[I]f the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States, NHTSA will approve a regional recall."). And, as indicated above, the guidelines notably conclude in a way to emphasize that the agency's position on regional recalls remains flexible. *Id.* at 3, *reprinted in* J.A. 82 ("[M]anufacturers must discuss all proposals to limit the geographic scope of any recall with [Office of Defects Investigation] prior to making any public statements regarding that scope.").

The 1998 policy guidelines certainly do not, as appellants contend, "read[ ] like a ukase." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). NHTSA has not commanded, required, ordered, or dictated. *Cf. id.* And there is nothing in the record to indicate that officials in NHTSA's Office of Defects Investigation are bound to apply the guidelines in an enforcement action. The agency remains free to exercise discretion in assessing proposed recalls and in enforcing the Act. *CropLife Am.*, 329 F.3d at 883. There is also nothing to indicate that automakers can rely on the guidelines as "a norm or safe harbor by which to shape their actions," *see Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation and internal quotation marks omitted), which might suggest that the guidelines are binding as a practical matter, *see id.* And it does not matter that agency officials have *encouraged* automakers to comply with the guidelines. *See Reliable Automatic Sprinkler,* 324 F.3d at 733 ("The agency's letter to [company officials] merely stated an 'intention of the Compliance staff to make the preliminary determination that these sprinklers present a substantial product hazard.' We do not know whether the agency will bring administrative enforcement proceedings against [the company].") (citation omitted).

Our conclusion that the guidelines amount to a general statement of policy, rather than a binding rule, is further fortified by the limited authority of the Associate Administrator for Safety Assurance. The agency concedes that Kenneth N. Weinstein, the apparent author of the guidelines, had authority to issue policy guidance for "NHTSA's enforcement program for vehicle safety." Initial Supplemental Br. for Appellee at 1. The agency argues, however, that neither Weinstein, nor anyone else in the position of Associate Administrator for Safety Assurance, had authority to issue guidelines with binding effect.

The record supports the agency's arguments on this point. *See* 49 C.F.R. § 501.3(a)(ii) (1998) (the Administrator

"[e]stablishes NHTSA program policies, objectives, and priorities"); 49 C.F.R. § 501.3(c)(3) (1998) (The Associate Administrator for Safety Assurance is "the principal advisor to the Administrator on the enforcement of motor vehicle standards and regulations, [and] directs and administers programs to ensure compliance with Federal laws, standards, and regulations relating to motor vehicle safety."); 49 C.F.R. § 501.8(g)(1) (1998) ("Except for those portions that have been reserved to the Administrator or delegated to the Chief Counsel, the Associate Administrator for Safety Assurance is delegated authority to exercise the powers and perform the duties of the Administrator with respect to . . . [a]dministering the NHTSA enforcement program[s]."). Tellingly, NHTSA's Chief Counsel has been delegated authority to "[i]ssue authoritative interpretations of the statutes administered by NHTSA." 49 C.F.R. § 501.8(d)(5) (1998). This authority does not reside with the Associate Administrator for Safety Assurance. Moreover, the Associate Administrator for Safety Assurance is specifically without authority to issue final regulations, other than those relating to the importation of motor vehicles, as that authority is reserved by the Administrator. *See* 49 C.F.R. §§ 501.7(a)(1), 501.8(g)(2) (1998).

In other words, Associate Administrator Weinstein had no authority to issue binding regulations or to make a final determination that specified regional recalls satisfy a manufacturer's duties under 49 U.S.C. § 30,118(c). And his statements regarding NHTSA's regional recall policy could not change an automaker's legal obligations under the Act. *See Nat'l Ass'n of Home Builders*, 415 F.3d at 16 (finding that there was no final agency action, in part, because "the scope of a [regulated party's] liability under . . . [the statute] remains exactly as it was before the [challenged] Protocols' publication").

23

In sum, the 1998 policy guidelines do not, as appellants claim, establish new rights and obligations for automakers. We find, instead, that they set out the agency's general policy statement with respect to regional recalls, and nothing more. "The effect of the [guidelines] is to inform the public of the types of [regional recalls]" that the agency is unlikely to seek to expand. *Pac. Gas & Elec.*, 506 F.2d at 40. But, as the concluding paragraph in the guidelines makes clear, "there is no assurance that any such plan will" go unchallenged. *Id*.

Appellants' final argument is that even if the guidelines do not determine rights and obligations, they had legal consequences. Appellants contend that the agency has altered the legal regime with consequence both for automakers – who now allegedly conform their practices to the agency's standards – and for automobile consumers – who allegedly own "defective" vehicles that do not qualify for recall remedies under the Act. They say that, for seven years, the agency and automakers have followed the standards announced in the guidelines. Appellants thus urge that, under a flexible and pragmatic approach to finality, as endorsed in decisions such as *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), the agency's 1998 policy guidelines must be seen to have legal consequences that confirm final agency action.

The flaw in appellants' argument is that the "consequences" to which they allude are practical, not legal. It may be that, to the extent that they actually prescribe anything, the agency's guidelines have been voluntarily followed by automakers and have become a *de facto* industry standard for how to conduct regional recalls. But this does not demonstrate that the guidelines have had *legal consequences*. The Supreme Court's decision in *Bennett* makes it quite clear that agency action is only final if it determines "rights or obligations" or occasions "*legal* consequences." 520 U.S. at 178 (emphasis added)

(citation and internal quotation marks omitted). Circuit case law cannot obviate the holding of *Bennett*.

As we explained only last term, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purposes of judicial review" under the APA. *Nat'l Ass'n of Home Builders,* 415 F.3d at 15. Here, the only consequences suggested by appellants are the automakers' voluntary compliance with NHTSA's guidelines on regional recalls, arguably in order to avoid any risk of the agency initiating a hearing under 49 U.S.C. §§ 30,118(e) or 30,120(e), or bringing an enforcement action pursuant to 49 U.S.C. § 30,118(a)-(b). But *de facto* compliance is not enough to establish that the guidelines have had *legal* consequences. *See Nat'l Ass'n of Home Builders*, 415 F.3d at 16 (rejecting as insufficient to establish legal consequences under *Bennett* appellant's "assert[ion] that local permitting agencies have adopted the [challenged] Protocols to guard against their own potential liability under [the statute]" absent a showing "that local officials were coerced by the [agency]" to adopt the Protocols). And there is nothing in the record here to indicate that NHTSA has "force[d] [the industry] to change its behavior, such that" NHTSA's position on regional recalls "may be deemed final agency action." *AT&T Co.*, 270 F.3d at 976.

It may be that some car owners continue to be disadvantaged by automakers' regional recall practices. But automobile manufacturers adhered to these practices long before NHTSA issued the 1998 policy guidelines. The adverse effects flowing from the regional recall practices surely are not a *legal consequence* of the guidelines, not only because the effects preceded the guidelines, but, more importantly, because the agency has never codified the practices in binding regulations.

### III. CONCLUSION

Appellants have no cause of action under the APA, because the contested 1998 policy guidelines do not reflect final agency action, and they do not otherwise constitute binding rules. We therefore affirm the District Court's judgment dismissing appellants' action.

*So ordered.*

RANDOLPH, *Circuit Judge*, concurring: In this case concerning the National Highway Traffic Safety Administration's "policy guidelines" for regional recalls, my colleagues and I reach the same destination by different paths. In my view, the "policy guidelines" at issue here do not constitute "final agency action," 5 U.S.C. § 704, because they do not impose any "legal consequences" on the regulated automakers. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Agency action is not final when it "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-33 (D.C. Cir. 2003); *AT&T Co. v. EEOC*, 270 F.3d 973, 975-76 (D.C. Cir. 2001). The letters of the Associate Administrator of the National Highway Traffic Safety Administration address the situation in which an auto manufacturer voluntarily proposes to recall its vehicles. *See* 49 U.S.C. § 30118(c). In this posture, the Administration, "[o]n the motion of the Secretary or on petition of *any interested person . . . may* conduct a hearing to decide whether the manufacturer has reasonably met the notification requirements under this section." *Id*. § 30118(e). To take an example, the Associate Administrator's letter to Ford, J.A. 142-46, requests voluntary compliance with the "general policy with respect to regional recalls," *id*. at 142, and merely *threatens* further administrative action. The Associate Administrator notes that if Ford chooses not to take the suggested actions, "the agency *may* commence a proceeding under 49 U.S.C. §[] 30118(e) . . .." *Id.* at 146 (emphasis added). If the threat were carried out, Ford and any interested person – including, presumably, the appellants – could present arguments at the hearing. The Administration would then make a final decision whether the manufacturer is in compliance with the statute. If not, the Administration could

order the manufacturer to take specific action. 49 C.F.R. § 557.8 (1998). This order, however, would not be self-executing. The Attorney General would have to file a civil action seeking enforcement. 49 U.S.C. §§ 30121, 30163. This case is closely analogous to *Reliable Automatic Sprinkler Co.*, in which we found that the Consumer Product Safety Commission's attempt to induce voluntary action by threatening to *initiate* administrative proceedings that could *possibly* lead to sanctions was not reviewable. 324 F.3d at 731-32. "To be sure, there may be practical consequences" from Ford's (or any other manufacturer's) decision not to comply with the Associate Administrator's letter, "[b]ut the request for voluntary compliance clearly has no legally binding effect." *Id.* at 732. The course of action that the auto makers choose is subject to administrative challenge both by NHTSA and by interested persons like appellants. Neither the letters threatening action nor the "guidelines" – merely a generic version of those letters – dictate the outcome of such challenges.

It may be that the Associate Administrator had authority "to issue[] policy guidance relating to NHTSA's enforcement program for vehicle safety," Initial Supp. Br. for Appellee at 1. But that authority tells us nothing about whether the guidance he issued is sufficiently final to support judicial review. It is not. The Associate Administrator's role is largely prosecutorial and the substantive policy described in the letters has not been adopted as agency policy. Although the Associate Administrator may *initiate and conduct* a hearing, 49 C.F.R. § 501.8(g)(1) (1998); *see also* Initial Supp. Br. for Appellee at 3, the Administrator has reserved the authority to "[m]ake final decisions concerning alleged safety-related defects." *Id.* § 501.7(a)(2) (1998). It is the Administrator, not the Associate Administrator, who has final say over the defect policy, and his decision is rendered only after an administrative hearing. The guidelines do not, therefore, represent the "consummation of the

agency's decisionmaking process." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

The National Traffic and Motor Vehicle Safety Act does not contain a specific provision authorizing judicial review. We are therefore confined to reviewing "final agency action[s]." 5 U.S.C. § 704. Because the action here is not final, it is not reviewable. *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 n.5 (D.C. Cir. 2005).